Donald ELLIS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 05–CF–302, 05–CF–376.

District of Columbia Court of Appeals.

Argued Jan. 8, 2008.

Decided Feb. 7, 2008.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Cortney Lollar, Public Defender Service, were on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, Lisa H. Schertler, and Eric

P. Gallun, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Following a jury trial, Donald Ellis was found guilty of one count of unlawful distribution of heroin in a drug-free zone[1] and of one count of willful failure to appear (FTA) at a status hearing in the heroin distribution case.[2] On appeal from his conviction and sentence on the heroin count,[3] Ellis principally contends that the trial judge erred by denying his pretrial motion to suppress his post-arrest show-up identification by Officer Anthony Commodore of the Metropolitan Police Department.[4] According to Ellis, the police lacked probable cause to arrest him or articulable suspicion to detain him. The government concedes that the trial judge erred by declining to suppress the show-up identification, but argues that the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (articulating standard where error is of constitutional magnitude). We accept the government's concession, and we conclude that under the Chapman standard, the error was not harmless. Accordingly, we reverse Ellis' drug conviction.

1. D.C.Code §§ 48–904.01(a)(1) & –904.07a (2001).

2. D.C.Code § 23–1327(a) (2001).

3. The heroin case is No. 05–CF–302. Ellis filed a notice of appeal in his FTA case, but he has not pressed this appeal No. 05–CF–376 or mentioned the issue in his brief. We treat No. 05–CF–376 as abandoned.

4. Ellis also contends that his in-court identification by Officer Commodore should have been suppressed.

# I.

## THE TRIAL COURT PROCEEDINGS

This case arose out of the sale of three ziplock baggies of heroin to Officer Commodore, who was acting under cover in a buy/bust operation, by two[5] individuals other than Donald Ellis. The offense is alleged to have occurred on November 5, 2003. The prosecution's theory was that Ellis was the "facilitator" of the unlawful sale, and that he brought Officer Commodore to the men who sold Commodore the heroin.

### A. The hearing on Ellis' motion to suppress identification

On December 2, 2003 a grand jury returned an indictment charging Ellis with distribution of heroin within one thousand feet of a playground, a daycare center, and a public housing project. On June 18, 2004, Ellis filed a motion to suppress any out-of-court or in-court identification of Ellis, on the ground, inter alia, that each identification was the fruit of an unlawful seizure. A hearing was held on the motion on November 2, 2004.

The sole witness at the motions hearing was Officer James Wilson, a member of the arrest team. For the most part, Officer Wilson's testimony was not based on personal knowledge. Rather, Wilson's account was based on a post-arrest conversation with Officer Commodore and on the

5. There was a possible inconsistency in the government's case as to whether the two men (other than Ellis) who were arrested in connection with this case were both involved in the sale of heroin to Officer Commodore, or whether one of them was selling to another buyer. This alleged inconsistency does not affect the issue raised by Ellis on this appeal, and we do not address it.

police documentation of the arrest. Wilson was not present when Ellis was taken into custody, nor did he observe the undercover sale.

Officer Wilson testified that he "believed" that Officer Commodore approached a suspect alleged to be Ellis at around six o'clock in the morning on Georgia Avenue near Park Road and Morton Street in northwest Washington, D.C. To the best of Wilson's knowledge, Officer Commodore and Ellis had a brief conversation about the possible purchase of narcotics by Officer Commodore, and Ellis told Commodore that he could take him to a location at which Commodore could purchase the drugs that he wanted. Officer Commodore followed Ellis to 620 Morton Street, where, according to Officer Wilson, the two men encountered two other individuals who were standing inside the building. Officer Wilson testified that the walk from Georgia Avenue to 620 Morton Street took approximately two to three minutes, and that Officer Commodore "indicate[d]" to Officer Wilson that he (Commodore) had an ample opportunity to observe the suspect's face and clothing. Officer Wilson could not recall whether it was light or dark outside at the time that Commodore and the suspect walked to the Morton Street address.

Officer Wilson testified that after Officer Commodore arrived at 620 Morton Street, he and one of the sellers engaged in a short conversation, after which Commodore purchased "I believe, it was three ziplocks of powder substance" from the two men who were standing in the hallway of 620 Morton Street. Officer Wilson confirmed that Officer Commodore did not purchase drugs from the suspect alleged to be Ellis, but from two other individuals.

Officer Wilson testified that after the purchase, Officer Commodore "broadcast a lookout for the three subjects, the facilitator and the actual two subjects who sold him the narcotics." [6] On cross-examination, Wilson told the court that he heard the broadcast lookouts, but that he could not recall the descriptions of the suspects:

Q. [Defense counsel] ... Did you, yourself, hear the broadcast ... lookout, the lookouts that were broadcast that day?
A. Yes.

\* \* \*

Q. What was the broadcast—what was the description of the lookout given for Mr. Ellis?
A. I don't recall.
Q. Did you yourself hear it?
A. Yes, I heard it.
Q. And who was the person giving the lookout?
A. The person giving the lookout, I believe, was Officer Commodore.
Q. But you're not sure?
A. No. He was the one that bought the drugs, so he would have to give the lookout.

Subsequently, the judge returned to the subject of the lookout:

The Court: Can I just ask you, sir, you testified earlier that you believed Officer Commodore was the one who gave the lookout but that's not something that you personally recall at this time?
The Witness: Right. But it's either—
The Court: Can I—That's what I want to know. You don't, at this time, recall whether it was Commodore or some other person?
The Witness: Or the Eyes,[7] right.

---

**6.** At trial, it was revealed that it was not Officer Commodore who broadcast the lookouts related to this case. On cross-examination in the motions hearing, Officer Wilson indicated that he could not recall which officer broadcast the lookouts.

**7.** This expression apparently means an officer who observed what had occurred.

[Defense counsel]: And—But do you re-call hearing three different lookouts, three different descriptions?

A. Yes.

Q. You do?

A. I do recall the lookout was for three different males, yes. I remember two was in the building. That was the first lookout. And then the one subject on Georgia Avenue.

Ellis was stopped "based on the description" broadcast in the lookout. According to Officer Wilson, the stop took place "approximately one block—maybe a block-and-a-half away," and about "two and half minutes" after the lookout for Ellis was transmitted. Officer Wilson indicated that Ellis was stopped after the two other suspects had been detained at 620 Morton Street.

Officer Wilson did not participate in the stop of appellant Ellis. It was Officer Wilson's understanding that Ellis was detained by members of the arrest team, who told him "to stand at the corner of, I believe it was Georgia [Avenue] and Morton—Georgia and Morton Street or it may have been Georgia and Park Road." Officer Commodore then rode by in an un-marked police vehicle, and according to Wilson, Commodore positively identified Ellis as the facilitator of the drug sale. Officer Wilson believed that Ellis was identified "approximately—probably five to six minutes" after the heroin was sold, but he based his belief on the police re-ports, and not on his own recollection. Officer Wilson did not recall what Ellis was wearing when he was stopped, and no description of Ellis was provided in any of Wilson's testimony.

## B. *The trial judge's ruling*

After Officer Wilson had testified, Ellis' attorney argued that the identification of her client should be suppressed. She claimed that Ellis was detained without probable cause or articulable suspicion, in violation of the Fourth Amendment, and that the show-up was impermissibly sug-gestive, in violation of the Fifth Amend-ment. With respect to the Fourth Amend-ment claim, counsel asserted that "based on this record, there is nothing that would suggest that there was probable cause to seize Mr. Ellis and hold him for an identifi-cation." The judge, after summarizing the testimony, and after making evidentiary findings consistent therewith, ruled, with-out further elaboration, that there was "probable cause to arrest the defendant following Officer Commodore's interaction with him." [8] The judge also rejected Ellis' Fifth Amendment claim, holding that there was nothing about the show-up procedure that made it more suggestive than any other ride-by identification.

## C. *The trial*

Ellis' trial began shortly after the trial judge had denied the motion to suppress identification. Officer Commodore was the principal prosecution witness, and his description of his encounter with Ellis was substantially similar to the second-hand account provided by Officer Wilson at the motions hearing. The government pre-sented proof that a large stash of 31 zi-plock bags of heroin was recovered at the Morton Street address, and that the other two men arrested, on that occasion were in possession of large amounts of cash, ($1,001 and $729 respectively).[9] The police

---

8. The judge was apparently under the impres-sion that the defense had raised Ellis' Fourth Amendment claim for the first time at the motions hearing. In fact, that claim was as-serted in Ellis' motion to suppress, and the

government also addressed it its written op-position.

9. The funds recovered, however, did not in-clude the bills used by Officer Commodore to purchase the heroin.

recovered no money from Ellis. Ellis' counsel did not contest the government's evidence regarding the sale of heroin to Officer Commodore by the men at 620 Morton Street, but she contended that Ellis was not the "facilitator." Ellis did not testify.

Two officers made in-court identifications of Ellis as the man who accompanied Officer Commodore to 620 Morton Street. Officer Commodore testified that Ellis was not wearing sunglasses or a hat, and that he was able to observe Ellis' face during their walk. Commodore stated that he had focused on Ellis' appearance so that he could provide a meaningful description, and he expressed certainty regarding his identification of Ellis. Officer Commodore testified that he recalled Ellis particularly well because this case involved his last undercover purchase before his transfer to another assignment.

Investigator Vincent Norris, one of the "eyes" of the buy/bust operation, testified that he was driving an unmarked police vehicle when he saw Commodore and Ellis walking along the street to the porch at 620 Morton Street. He observed another man reach up over a door and provide drugs to Officer Commodore, while Ellis was standing nearby. Norris testified that he was "one of the ones" who broadcast a look-out description of the man who had walked with Officer Commodore. He stated that the description included Ellis' height, weight, clothing, and that had "got a good look at" Ellis. The parties stipulated that Investigator Norris did not participate in the show-up identification of Ellis shortly after the latter's arrest.

The in-court identifications of Ellis were made on November 4, 2004, one year minus one day after Ellis' arrest.

## II.

## LEGAL ANALYSIS

### A. *The government's concession*

■ As we have noted in reciting the facts, the government presented no testimony at the hearing on the motion to suppress with regard to the content of the lookout broadcast by the police. Further, no such evidence was introduced at the trial. The government now concedes, in its brief on appeal, that at least with respect to the show-up identification by Officer Commodore, Ellis' motion should have been granted. We quote the government's concession:

In *Milline v. United States,* 856 A.2d 616 (D.C.2004), this Court held that, "without more, conclusory testimony by police officers that a defendant matched an unknown description of the suspect is not a sufficient basis for a judge to determine that a stop was justified." *Id.* at 619. Although *Milline,* (which was decided only a few months before trial in this case) was not brought to the attention of the trial court, appellant now contends that the trial court should have granted his pre-trial motion to suppress identification "because the government did not present any evidence from which the judge could have made an independent determination that there was reasonable, articulable suspicion or probable cause" as required by *Milline* . . . . Although it is a close question, we acknowledge that the government's failure to elicit the details of the lookout description presented the trial court with the type of "conclusory" testimony that *Milline* has indicated is not sufficient to sustain the government's burden in defending against a motion to suppress. Nonetheless, this Court should affirm appellant's conviction, because the admission of testimony concerning the

show-up identification procedure was harmless beyond a reasonable doubt.

In conformity with our general practice, we accept the government's concession, especially where, as here, "the government appears to have deliberately conceded [the] issue as a matter of appellate strategy, rather than merely failing to argue the point inadvertently." *Rose v. United States,* 629 A.2d 526, 536 (D.C.1993). Moreover, in this case, the government's concession was not improvident. Indeed, it is consistent not only with *Milline,* but also with our precedents. *See, e.g., In re T.L.L.,* 729 A.2d 334, 341 (D.C.1999), in which we held that the trial judge has the responsibility to make an independent assessment of the sufficiency of the basis for a stop, and that in order to do so, the judge must be "apprised of sufficient facts to enable him [or her] to evaluate the reliability of that information." *Accord, Sanders v. United States,* 751 A.2d 952, 955 (D.C.2000).

Ellis also contends, and the government expressly concedes, that in light of the constitutional nature of the error, we may affirm only if the government demonstrates that the error was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 23, 87 S.Ct. 824.

B. *Whether the error was harmless beyond a reasonable doubt*

■ In support of its claim that the erroneous admission of evidence of the show-up was harmless, the government argues that the courtroom identifications of Ellis by Officer Commodore and Investigator Norris were reliable, because both officers had ample opportunity to observe Ellis, and because both men were trained observers. We do not doubt that the officers' in-court identifications, albeit patently suggestive, would have been sufficient to

withstand a motion for judgment of acquittal. *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("evidence with some element of untrustworthiness is customary grist for the jury mill"); *United States v. Hunter,* 692 A.2d 1370, 1374 (D.C.1997) (in all but exceptional cases, "it is the function of the jury to determine whether eyewitness identification is reliable"). Sufficiency, however, is not the issue in this case. As the en banc court recently explained in *Wilson–Bey v. United States,* 903 A.2d 818, 844 (D.C. 2006) (en banc), *cert. denied,* —— U.S. ——, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007),

> "[m]ere sufficiency of the evidence does not dictate a finding of harmless error." *Bell v. United States,* 801 A.2d 117, 129 (D.C.2002). Even under the less rigorous standard of *Kotteakos,*[10] "analysis under the harmless error doctrine should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence." *[Raymond] Brooks v. United States,* 367 A.2d 1297, 1309 (D.C.1976); *see also Clark v. United States,* 593 A.2d 186, 192 (D.C.1991). To conclude that an error is harmless, we must find it *"highly probable that [that]* error did not contribute to the verdict." *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir.1987) (emphasis added) (quoting *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977)); *Clark,* 593 A.2d at 192; *see also In re Ty.B.,* 878 A.2d 1255, 1267 (D.C.2005). In the present case, as we have seen, the issue is whether the error was harmless beyond a reasonable doubt, and the foregoing authorities apply a *fortiori* in [the appellant's] favor.

■ "Harmless beyond a reasonable doubt" is an exacting standard indeed.

---

10. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)

(articulating non-constitutional standard for harmless error).

The properly admitted evidence against the defendant must be "overwhelming." *McCoy v. United States*, 890 A.2d 204, 212 (D.C.2006). The government must show that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman*, 386 U.S. at 23, 87 S.Ct. 824. Indeed, the "inquiry [under *Chapman*] ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether *the guilty verdict actually rendered in this trial was surely unattributable to the error*." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (emphasis added).

The government's argument boils down to the proposition that the courtroom identification of Ellis by the officers, almost exactly a year after the offense was committed, was so overwhelming that the show-up identification, minutes after the officers' observation of Ellis, did not contribute to the verdict in any way. We rejected an almost identical argument in *T.L.L.*, 729 A.2d at 343:

> The District contends that, even if the show-up identification should have been suppressed, this court should affirm the adjudication of guilt on the strength of Hatcher's identification of T.L.L. in the courtroom. The District relies primarily on *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). We do not agree with the District's position.
>
> The trial judge's error in admitting evidence of the show-up identification in violation of the Fourth Amendment was constitutional in nature. The courtroom identification was made ten months after the robbery, and we cannot conclude, without further findings by the trial judge, that the admission of the earlier identification, made less than an hour after the offense, was harmless beyond a reasonable doubt. (Citing *Chapman*, 386 U.S. at 24, 87 S.Ct. 824).

We therefore reversed T.L.L.'s adjudication of guilt, and we directed the trial court to consider, on remand, and in advance of any new trial, whether the courtroom identification "rested on the [witness'] independent recollection of the initial encounter and was not a fruit of the earlier, constitutionally flawed identifications." *Id.; accord, People v. Jackson*, 74 N.Y.2d 787, 545 N.Y.S.2d 95, 543 N.E.2d 738, 739 (1989) (where the lineup testimony of two prosecution witnesses should have been suppressed, "... there must be a reversal and a retrial. Should the People elect to seek admission at the new trial of the in-court identification testimony of the two witnesses who viewed the lineup, they will be entitled to a hearing at which they have the opportunity to establish an independent source for that testimony.").

The notion that, on a record such as this one, the jurors relied solely on the in-court identifications and were not influenced at all by the testimony regarding the show-up identification, is contrary to common experience and, indeed, flies in the face of common sense. Unsurprisingly, "juries are inclined to be skeptical of courtroom identifications," *In re W.K.*, 323 A.2d 442, 444 (D.C.1974), on account of the "inherent suggestiveness in a defendant's location next to his counsel at trial." *Jackson v. United States*, 395 A.2d 99, 105 (D.C. 1978).[11]

---

11. *See also In re Dwayne W.*, 109 Daily Wash. L. Rptr.1901, 1905–06 (Super.Ct.D.C.1981):

As the Supreme Court observed in [*United States v. Wade*], 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor.

The Court alluded to some of the compilations of cases in which eye-witness identification has resulted in the arrest and convic-

A show-up identification shortly after the witness has observed the defendant, on the other hand, is routinely admitted, notwithstanding a measure of suggestiveness, because its promptness substantially reduces the likelihood that the witness will identify the wrong person. *Hunter*, 692 A.2d at 1375 (citing authorities). As we noted in *Hunter*,

> [t]he admission of evidence of such identification is consistent with common sense and sound practice; a prompt showup enhances the reliability of an identification and may, as in this case, exonerate an innocent person who has been mistakenly apprehended.

*Id.* Indeed, we have stated that "an immediate on-the-scene confrontation has *uniquely powerful indica of reliability* which more than counterbalance any suggestivity, absent special elements of unfairness." *Singletary v. United States*, 383 A.2d 1064, 1068 (D.C.1978) (emphasis added); *see also Hunter*, 692 A.2d at 1375 (quoting *Singletary*). We do not believe that these "uniquely powerful indicia of reliability" will ordinarily be lost on a conscientious and intelligent juror.

Moreover, in his closing argument, the prosecutor focused heavily on the show-up identification:

> Five minutes after this transaction [was] completed, after the detective had gone to his car, field tested the drugs, the arrest team moved in. .... The defendant had gone back up on Georgia[ ] Avenue[.] [T]he arrest team moved in[.] [W]ithin five minutes Detective Commodore did this drive-by and said, you got him. That's him. You got him.

> Let me ask you, ladies and gentlemen, five minutes—You have an opportunity now to observe me, see what I'm wearing, look at my face. If I were to walk out of this courtroom for five minutes and walk back in, would you recognize me, because it happened several times yesterday.

> Maybe I wasn't out of the court for five minutes. I stepped out to retrieve a witness, maybe I was 45 seconds or a minute, I came back in. Were you confused about my identity or did you recognize me?

The prosecutor's concentration on the brief time that elapsed between the offense and the show-up reveals that he regarded the show-up as extremely persuasive evidence. "[A] prosecutor's own estimate of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice," *Andrews v. United States*, 922 A.2d 449, 461 (D.C.2007) (quoting *Garris v. United States*, 129 U.S.App. D.C. 96, 100, 390 F.2d 862, 866 (1968)), and it bears heavily on the centrality of the error. *Hill v. United States*, 858 A.2d 435, 448 (D.C.2004).

tion of the "wrong man." 388 U.S. at 228, n. 6[87 S.Ct. 1926]. The problems with identification evidence are also reflected by cases such as *People v. Gow*, 65 Ill.App.3d 723, 382 N.E.2d 673 (1978), in which the witnesses identified a stranger seated next to defense counsel as the criminal while the defendant sat elsewhere in the room.

Nor is the *Gow* case an aberration. In Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stanford Law Review 969, at n. 3 (1977), (hereinaf-

ter *Did Your Eyes Deceive You*) the author relates that

> [A] judge in New York City developed his own system to check on the frequency of mistaken identifications. In ten cases in which the identification of the accused was virtually the only evidence, the judge permitted defense attorneys to seat a look alike alongside the defendant. In only two of the ten cases was the witness able to identify the defendant. TIME, April 2, 1973, at 59.

It is, of course, *possible* that Ellis would have been convicted even if the prosecutor had not introduced, and if the trial judge had not admitted, evidence of the show-up identification. The existence of such a possibility, however, is not equivalent to proof that the error was harmless beyond a reasonable doubt. Accordingly, Ellis' conviction of distribution of heroin in a drug-free zone (No. 05–CF–302) is reversed, and the case is remanded for further proceedings consistent with this opinion. Ellis' conviction of willful failure to appear (No. 05–CF–376) is affirmed.

*So ordered.*[12]

12. In light of our disposition, we do not reach Ellis' claim that he was denied his right, secured by the Sixth Amendment, to confront the DEA chemist who analyzed the drugs sold to Officer Commodore and who concluded that the contraband was heroin. *See Thomas v. United States,* 914 A.2d 1 (D.C.2006); *cf. Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).