951 A.2d 793 (2008)
In re K.P., Appellant.
No. 06-FS-590.
District of Columbia Court of Appeals.
Argued June 3, 2008.
Decided July 3, 2008.
*794 O. Dean Sanderford, Public Defender Service, with whom James Klein and Alice Wang, Public Defender Service, were on the brief, for appellant.
Sidney R. Bixler, Assistant Attorney General, with whom Linda Singer, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.
Before RUIZ and KRAMER, Associate Judges, and FARRELL, Associate Judge, Retired.[*]
FARRELL, Associate Judge, Retired:
This appeal asks us to decide whether police responding to a 911 call that reported armed threats had enough information to justify stopping a group of juveniles including appellant, one of whom  but without knowing which  they suspected of making the threats. The trial court found that the group matched the description given the police by the complainant, and thus denied a motion to suppress her ensuing show-up identification of appellant as the person who had threatened her. Partly on the basis of that identification, appellant was adjudicated delinquent.
Appellant argues, principally, that the trial court's finding of a sufficient link between the group that accosted the complainant and the group seized was erroneous, because no record evidence supported an inference that the police had received information particularized even as to the group  much less appellant  enough to justify the stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We agree with appellant and reverse the adjudication of delinquency. What information precisely the complainant conveyed to the police dispatcher in her 911 call is unknown, because the recorded call (though seemingly in the possession of the parties at the hearing) was not introduced into evidence.[1] As the government recognized at oral argument, the record of what the police learned from the complainant is thin, and in our view it is too insubstantial to demonstrate the reasonable, articulable suspicion required by Terry.

I.
The complainant, Yuliis Galery, was seated on her parents' front porch with her *795 cat in the 1600 block of Monroe Street, N.E., at about 9:15 p.m. when a group of six or seven black male juveniles approached her from down the street. One, who had been banging on street signs with a stick, stepped onto the first of a set of steps leading up to Galery's front yard and held the stick raised as if to strike her cat. When Galery said, "You'd better not hit my cat," the individual  whom she later identified as appellant, K.P.  replied, "I got a hammer right here. What do you want to do[?]," and "`F' you, stupid `B,' . . . I'll shoot you and your cat." Galery understood "hammer" to mean a gun since she had heard it used as a "street term.'" K.P. also lifted his shirt as he spoke the words, although Galery could not tell whether there was a weapon in his waist or only a belt buckle.
When the group left, Galery telephoned the police and, as she testified, told them "what happened." Minutes later police arrived at her house and took her to the intersection of Newton Street and 12th Street, N.E., where other police had stopped and frisked a group of juveniles. From this group Galery identified K.P. as the person who had made the statements to her.
As pointed out, the tape of Galery's phone call to the police was not offered into evidence. Questioning her at the suppression hearing with apparent reference to it, however, K.P.'s lawyer elicited that Galery had first told the police that the group, on leaving her house, had turned either north (toward Newton Street) or south (toward Lawrence Street) before moving west toward 12th Street, N.E., "the most known, busy street . . . in the area" (in her words). Galery further explained that, while still on the phone with the police, she left her porch to "check[ ] to see which way [the group had] walked," and when she saw them "cutting up toward Newton Street" she mentioned this fact to a police officer (Grimes) who had arrived at her house in the meantime. Grimes told her that the police had "stopped someone and they were gonna take me [to Newton and 12th Streets]" to see if she could identify the person who threatened her.[2] Galery gave no additional testimony, at the suppression hearing or trial, about the contents of her phone call to the police. Nor did she testify that she had described the group or its members to the police, other than possibly as a "group of kids."
MPD Officer Carey was the lone police witness at the hearing. Part of a robbery detail working in the area, Carey "responded to the 1200 block of Newton Street, N.E." at about 10:00 p.m. that night because of a radio report that "a juvenile that supposedly had a gun . . . was walking in a group of juveniles." The 12th Street area "was . . . known . . . for problems in reference to robberies," and when Carey and his team arrived they saw "approximately 5 to 6 juveniles crossing . . . from the south side to the north side of the 1200 block of Newton Street . . . matching the description of the individuals . . . given over the secure channel that the robbery task force operates on." Asked, however, if he "recall[ed] what that description was that was given over the secure channel," Carey answered: "Not at this time." He offered no additional explanation of the basis for the stop.

*796 II.
Under Terry, supra, "[t]he Fourth Amendment permits a police officer to stop an individual for investigatory purposes so long as the officer possesses a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity." Milline v. United States, 856 A.2d 616, 619 (D.C. 2004) (citation and internal quotation marks omitted). In general, "to pass muster under Terry . . . the articulable suspicion must be `particularized as to the individual stopped.'" In re T.L.L., 729 A.2d 334, 340 (D.C.1999) (quoting In re A.S., 614 A.2d 534, 537 (D.C.1992)). The government concedes that the information communicated to the police by Ms. Galery did not provide particularized reason to stop K.P. From what the record reveals, she gave the police no description of K.P. or, indeed, any individual member of the group that would meet the particularity requirement. Officer Carey, for his part, could recall no "description of the individuals" that caused him to stop K.P. or any other individual on particularized suspicion that he was the person who had threatened Galery.
The government instead relies on a "narrowly circumscribed" exception to Terry's particularity standard recognized by the court in Williamson v. United States, 607 A.2d 471 (D.C.1992), to argue that even though the police lacked articulable reason to suspect K.P. personally of the crime, they were justified in stopping the group of juveniles "either [as] participants in the [threats] or [as] witnesses to it who could provide material information about the event and the . . . identity of the [perpetrator]." Id. at 476 (emphasis in original). The government argues that the "exigent circumstances" required by the Williamson exception, id., are made out here by the report of a violent crime (threats with a gun) occurring minutes earlier and the risk that the perpetrator(s) would soon disperse. K.P. responds that no court decision cited by the government has allowed a "material witness" detention to justify the sequence of privacy invasions shown here: a stop, followed by a frisk of each group member, followed by a show-up procedure in which each member was brought, individually, up to the car in which Galery was seated and a searchlight focused on him. More basically, however, K.P. argues that the police lacked the necessary particularized suspicion that this group of juveniles had been the one from which an individual emerged to threaten Galery. Because we agree with the latter point, we have no occasion to consider whether the scope of the detention exceeded the limits of a permissible stop under Williamson.[3]
The rule substantially controlling our decision here is that, "without more, conclusory testimony by police officers that a defendant matched an unknown description of the suspect is not a sufficient basis for a judge to determine that a stop was justified." Milline, 856 A.2d at 619 (footnote omitted); see also Sanders v. United States, 751 A.2d 952, 955 (D.C. *797 2000) ("A court may not simply rely on a police officer's conclusory assertions in deciding whether a search or seizure was justified"). The same rule perforce applies to the stop of a group of individuals. See Milline, 856 A.2d at 619 (appellant would be entitled to relief if he was correct that the trial court "could [not] assess the sufficiency of the description to justify a stop of anyone" in the group described (italics in original)); Cauthen v. United States, 592 A.2d 1021, 1023 (D.C.1991) (holding that tip lacked specificity sufficient to justify stop of group suspected of selling drugs). Here, Officer Carey could not recall the information relayed to his team that caused him to believe that the group of juveniles "match[ed] the description" Galery had given to the police. See Milline, 856 A.2d at 619 (stop would have been improper "if we had nothing but the officers' testimony that Milline matched a now-forgotten description in [the radio] lookout"). And, as noted, neither the radio run (assuming it had been recorded) nor the tape of Galery's 911 call was put in evidence to explain what Carey meant by the "description."[4]See also Ellis v. United States, 941 A.2d 1042, 1047 (D.C.2008) (noting government's concession that its "failure to elicit the details of the lookout description presented the trial court with the type of `conclusory' testimony that Milline has indicated is not sufficient to sustain the government's burden in defending against a motion to suppress").
The government seeks support from Galery's testimony of what she told the police, including Officer Grimes when he arrived at her house soon after the threats. But her testimony adds little to the sum of information furnished to the trial court. It does not reveal how (or if) she described the person who had threatened her or whether she described any of his companions, and is skimpy even as to whether she told the dispatcher how many young people were in the group. See Br. for District of Columbia at 11 (conceding that "the victim did not testify as to the description she had given of the group"). In essence, the record shows only that she told the dispatcher "what happened," which no more sufficed to connect the group that accosted her and the juveniles stopped than did Carey's conclusory assertion that her description "matched" the people stopped.
The government vainly relies on the directions Galery gave the police about where the group had headed. The most the court learned in this regard is that she told the dispatcher that the group had walked either north or south from Monroe Street before turning west toward 12th Street, some four blocks away.[5] Without any other more specific identifying information, this left too much leeway for the *798 police to stop any group of juveniles walking in that area of 12th Street  a street Galery herself knew to be "busy" at 10:00 in the evening. In Cauthen, supra, we held that a citizen report that three or four persons were selling drugs at a named intersection, but that gave "no physical description of the suspects by sex, race, size, clothing or any other distinguishing feature," furnished "no details which [police] could confirm fifteen minutes later with any reasonable expectation that appellant was one of the persons reported selling drugs." 592 A.2d at 1023, 1025. Although the time interval here was slightly more abbreviated, we likewise conclude that the police, on the information conveyed by Galery, had no reasonable expectation that the group they stopped  much less K.P. as an individual  had accosted Galery at her home more than four blocks away. The trial court erred in finding otherwise.
Thus, because the show-up identification of K.P. was the product of an unlawful seizure, it should have been suppressed. See In re T.L.L., 729 A.2d at 343. And, because we cannot say that admission of that identification was harmless beyond a reasonable doubt, see Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the adjudication of delinquency must be reversed. The government disputes this conclusion by arguing that Galery also made an in-court identification of K.P. at trial[6] and that, if the trial court on remand were to find that she had an "independent recollection of [her] initial encounter with [K.P.]," the judgment may be sustained, quoting United States v. Crews, 445 U.S. 463, 473, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). We rejected this no-prejudice argument in Ellis, supra, and do so here for the reasons stated there. See 941 A.2d at 1049-50.[7] As K.P. concedes, on the other hand, should the government seek to retry him, it may do so based on the in-court identification alone if  and only if  the trial court concludes "in advance of . . . trial . . . [that] the courtroom identification . . . was not a fruit of the earlier, constitutionally flawed identification[ ]." Id. at 1049 (quoting In re T.L.L., 729 A.2d at 343 (citing Crews)).
Reversed and remanded.
NOTES
[*] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.
[1] Nor, assuming that it was recorded, was the radio dispatch to patrol officers reporting her crime complaint offered in evidence.
[2] At the trial, Galery testified in keeping with her hearing testimony: "[T]hey arrived and I was still on the phone . . . [T]hey asked me a few questions and I remember telling them . . . which direction [the group] went in. And then they told me oh, they'd stopped a group. Like shortly after they arrived they told me they stopped a group and they asked if I wanted to go with them to I-D them."
[3] The government weakly argues that, aside from the Williamson analysis, the police had reason under classic Terry doctrine to suspect that each member of the group had aided and abetted the person making the threats. To this it is enough reply that neither Galery nor Carey testified that she had told the police anything casting K.P.  or anyone else in the group  in the role of a criminal accomplice to the person who made the threats. Galery did testify that the other group members had been laughing and talking among themselves while the threats were made, but that is doubtful evidence, even for Terry purposes, of criminal complicity; and equally important, there is no record suggestion that she conveyed that information to the police.
[4] Indeed, viewing Carey's testimony alone, the reason why he had stopped a group of juveniles at 12th and Newton Streets and not somewhere else may be suggested by his words: "We responded to 12th Street. That was a known area for problems in reference to robberies that were in that area." (Emphasis added.)
[5] The government notes that Galery told Officer Grimes, on his arrival at the home, that the group had turned into Newton Street, thus giving narrower circumference to the area in which they would likely be found. But, though Grimes's knowledge could (as K.P. concedes) be imputed to the seizing officers, see McFerguson v. United States, 770 A.2d 66, 72-73 (D.C.2001), Galery's testimony revealed that the stop of the juveniles had taken placed before she related this information to Grimes. See note 2, supra, and accompanying text.

The government mentions, as additional justification for the stop of K.P.'s group, trial testimony by his brother that he did not recall seeing "anyone else out that night while [they] all were walking." In context, however, this appears to refer to the point in time earlier when the group was approaching Galery's house (one of them "hitting these stop signs" with a stick) on Monroe and 16th Streets. Officer Carey was not asked whether other juveniles were out and about in the Newton and 12th Streets area that evening, and the government offered no proof tending to exclude the presence of other such groups at 10:00 p.m. in the "busy" 12th Street area Galery described.
[6] Actually it is not clear that she did so, for in court she pointed out K.P. only as the individual that she had "identified on November 5, 2005 as the person" who had threatened her and had been "very sure" he was that person "when [she] identified him at the scene."
[7] Although trial here was to the court and not (as in Ellis) to a jury, nothing in the judge's findings suggests that he "relied solely on the in-court identification[ ] and [was] not influenced by the testimony regarding the show-up identification," a supposition that "flies in the face of common sense." Ellis, 941 A.2d at 1049.