*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0445

GENE C. CLAYTON JAMES, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF3-019074)

(Hon. Todd E. Edelman, Motions and First Trial Judge)

(Hon. Michael O'Keefe, Second Trial and Sentencing Judge)

(Argued October 26, 2021                    Decided August 1, 2024)

*Peter H. Meyers* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time of filing, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Brittany Keil*, *John Korba*, and *Julia Cosans*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

BECKWITH, *Associate Judge*: In the wake of a reported carjacking, a police dog tracking a scent from the stolen (and subsequently abandoned) car led officers to the general vicinity of an apartment complex before losing that scent. Around

that same time, Appellant Gene James was coming out of one of the buildings in the complex when police confronted him, took him back inside the apartment building, asked him some questions, and eventually arrested him. Prior to Mr. James's trial on several charges related to the carjacking, the trial court in this case ruled that when police officers stopped Mr. James, they did not have reasonable suspicion to believe he was involved in a crime, and so the stop violated Mr. James's Fourth Amendment right to be free from unreasonable searches and seizures. The court therefore partially granted Mr. James's motion to suppress certain evidence that resulted from the unlawful stop. As to one key piece of evidence, however—a rifle found during a second search of a laundry room in the building Mr. James was leaving—the court ruled that, because officers' search of the laundry room was not triggered by anything that happened during their detention of Mr. James, the rifle was not a fruit of the illegal stop. At trial, the government introduced the rifle as the weapon used in the carjacking, and Mr. James was ultimately convicted of all the charges against him.

On appeal, Mr. James continues to argue that the rifle should have been suppressed because police searched the laundry room a second time only after stopping and speaking with Mr. James. The government disputes that any statements Mr. James made during the course of his detention—or other post-stop facts—are what prompted police to search the laundry room again and discover the

previously overlooked rifle. We conclude that specific indications in the record of a causal connection between the illegal detention and the rifle's discovery required suppression of the rifle as a fruit of that detention. We therefore reverse Mr. James's convictions.

## I.

The evidence at the hearing on Mr. James's motion to suppress—primarily from three police officers' testimony and the video from two officers' body-worn cameras—was as follows.

One night a little before 10 p.m., Metropolitan Police Department (MPD) officers received reports of a carjacking with shots fired near the intersection of 16th and W Streets, SE. According to one report, the carjacking had been carried out by three Black men dressed in black. Police received a general description of the suspects: two "were roughly the same height, armed with handguns," and the other "had a dreadlock hairstyle" and was "armed with a long rifle."

Within fifteen minutes, officers found the stolen vehicle abandoned in the 1800 block of Morris Road, SE. Haas, one of the dogs in the MPD's K-9 unit, tracked the scent of the car's driver for two blocks and led officers to an apartment complex on Gainesville Street before losing the scent. Sergeant Jeffrey Kopp and

Haas's handler, Officer David Hobbs, entered an apartment building at 1811 Gainesville Street, accompanied by Haas. Footage from Sergeant Kopp's body-worn camera shows the officers going into the laundry room on the second floor of that building, conducting a brief sweep, and finding nothing. They conducted a similar sweep of the third floor and again found nothing.

Meanwhile, other MPD officers involved in the search spotted Gene James exiting the building next door at 1817 Gainesville Street, "putting on clothes" as he walked.[1] Officer Abraham Lazarus ordered officers to "stop him" and radioed in a description of a "black male suspect" with "shoulder-length dreads" wearing a hoodie and turquoise-colored pants.[2]

Sergeant Kopp—who had just searched 1811 Gainesville Street with Haas and Officer Hobbs—walked around to the entrance of 1817 Gainesville Street, where he saw Officers Andrew Chandler and Steven Roselle placing their hands on Mr. James and moving him inside the building. Mr. James asked why he had to go inside,

---

[1] The record includes body-worn camera footage from Sergeant Kopp and Officer Abraham Lazarus, another officer who reported to the scene. The footage covers portions, but not the entirety, of Mr. James's encounter with MPD officers.

[2] Video footage of Mr. James during the encounter shows him wearing a gray hoodie with bright lettering, turquoise-colored shorts with black leggings underneath them, and bright red socks.

saying that he was "not under arrest" and had not done anything wrong. Sergeant Kopp, who had stepped in to help the other officers handcuff Mr. James, told Mr. James that he was "detained at this moment." Officers Chandler and Roselle then spoke with Mr. James, but much of their conversation is either not captured or cannot clearly be heard on the body-worn camera footage admitted at the hearing.

Approximately four minutes after Mr. James was placed in handcuffs, Sergeant Kopp—who had momentarily stepped outside to speak with another officer—walked back into 1817 Gainesville Street, where his fellow officers were questioning Mr. James, and began a search of the building. He conducted a sweep of all three floors, including the laundry room on the second floor, where he looked in the open machines and between the machines and the wall. Sergeant Kopp testified that he noticed a blue bag behind the machines but he did not find anything he viewed as significant during his sweep of the building. Shortly after, Officer Roselle—who had just been speaking with Mr. James—conducted a second search of the laundry room and found a semiautomatic rifle inside the blue bag that Sergeant Kopp had seen behind the machines.

The trial court ruled that the police violated the Fourth Amendment by detaining Mr. James without reasonable articulable suspicion. The court concluded that the seizure was "a stop and not an arrest" and suggested that it occurred around

the time that officers handcuffed Mr. James.[3]  The court thus suppressed as "a fruit of the stop" a piece of clothing that Mr. James had dropped "as part of his submission to the officer's authority."[4]  But with respect to the rifle, the trial court did not "see factually any connection between the stop of Mr. James and the discovery of the gun other than [that] one occurred temporally before the other."  In the court's view, certain evidence—such as the fact that officers first searched a building that was "not the building Mr. James was seen coming out of"— "fairly well demonstrate[d] that they were going to search those areas, regardless of whether or not Mr. James was stopped."  Given those circumstances, the trial court concluded that "the discovery of the gun was not related to or a fruit of the stop of Mr. James."

At Mr. James's trial, officers testified to facts that largely tracked those presented at the motion hearing.  The complainant, Andre Watkins, also testified

---

[3] The trial court initially did not pinpoint the precise time the stop occurred, but later identified that moment as when officers "instruct[ed] him to go back into the building and one of the officers [was] physically touching him while they [did] that."  That ruling took place during a continuation of the suppression hearing after the start of trial—a proceeding the trial judge at one point described as "nunc pro tunc"—which the court deemed necessary to make a more specific assessment about the admissibility of certain identifications of Mr. James that may have been fruits of the stop.

[4] The court also suppressed photos of Mr. James in handcuffs after he was illegally stopped and an out-of-court identification by the complainant that was based on Mr. James's arrest photo.

about the carjacking itself. In particular, Mr. Watkins described having wrestled over a rifle with a black male assailant wearing dreadlocks, but in court he did not positively identify Mr. James as a perpetrator of the offense. The government presented expert testimony that Mr. James's fingerprint was on Mr. Watkins's cell phone found in the stolen car, that Mr. Watkins's DNA profile was on the rifle found in the laundry room, and that shell casings at the scene could have been fired from that rifle.

The jury found Mr. James guilty of possession of a large-capacity ammunition feeding device, D.C. Code § 7-2506.01(b), but deadlocked on armed carjacking and the related remaining charges, resulting in a mistrial on those counts. At a second trial, a jury convicted Mr. James on all unresolved counts.[5]

## II.

Mr. James argues, among other things, that the trial court erred in declining to suppress the rifle police seized shortly after illegally detaining him.[6] On appeal from

---

[5] Those counts included armed carjacking, armed robbery, and various related assault and weapons offenses.

[6] Mr. James raises several additional arguments: (1) that the government's firearms and toolmark expert gave an impermissible unqualified opinion at trial; (2) that the trial court erroneously believed it was required to impose a mandatory

the denial—or, as here, the partial denial—of a motion to suppress evidence, we review legal issues de novo, defer to the trial court's factual findings unless they are clearly erroneous, and view the facts in the record in the light most favorable to the court's ruling. *Mayo v. United States*, 315 A.3d 606, 616-18 (D.C. 2024) (en banc).

"Generally, when physical or testimonial evidence is uncovered by an illegal search or seizure, it must be suppressed as the 'fruit of the poisonous tree.'" *Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (quoting *Clark v. United States*, 755 A.2d 1026, 1029 (D.C. 2000)). The "critical inquiry" in determining whether the rifle here was a fruit of the Fourth Amendment violation is whether it was found "by exploitation of th[e] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Jones v. United States*, 168 A.3d 703, 721 (D.C. 2017) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Here, where the rifle was discovered minutes after police unlawfully stopped Mr. James, one floor above where they were holding him, by an officer who commenced a second search of the laundry room after talking to Mr. James, Mr. James made the requisite initial showing of illegality and a plausible causal connection between that illegality

---

fifteen-year sentence for armed carjacking; and (3) that some of Mr. James's convictions merge. In light of our disposition on the suppression issue, we do not reach these issues.

and the discovery of the evidence. *Cf. Brown v. United States*, 313 A.3d 555, 563 (D.C. 2024) (stating that because Brown had "at least made a 'prima facie showing'" that the search of his pocket had a "causal connection to the alleged fruit," the government bore the burden to justify the admissibility of that fruit under an "exception to the exclusionary rule" (quoting *Crews v. United States*, 389 A.2d 277, 289 (D.C. 1978) (en banc), *rev'd on other grounds*, 445 U.S. 463 (1980))). It is thus "the government's burden to show that the initial illegality did not taint its subsequent discoveries."[7] *Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022) (citing *Evans v. United States*, 122 A.3d 876, 885 (D.C. 2015)).

To overcome a motion to suppress the fruit of an illegal search or seizure, the government must persuade the court that the evidence is admissible—in this case, that the discovery of the rifle was not related to Mr. James's illegal detention.[8]

---

[7] The government sees the burden as belonging to Mr. James. In its view, the trial court was right to deny suppression "where appellant failed to show" that the discovery of the rifle was the fruit of Mr. James's illegal stop. The trial court's own conclusion that it was "the government's burden on the fruits issue" signals that it correctly viewed the burden as having shifted in light of its finding of a Fourth Amendment violation that required the suppression of at least some evidence obtained in the ensuing investigation.

[8] The government may also meet its burden by showing that the discovery of the evidence falls within some exception to the exclusionary rule, such as the inevitable-discovery exception. *See Utah v. Strieff*, 579 U.S. 232, 238 (2016)

As noted above, the trial court ruled that the government had demonstrated that discovery of the rifle was not related to the stop. In the court's view, even though the detention and search occurred in close temporal proximity, the fact that the MPD officers were searching the whole area—including, most notably, the laundry room of the building next door—irrespective of any information gleaned from Mr. James's stop indicated that the unlawful seizure of Mr. James did not trigger the search of the laundry room where the gun was found.

The trial court's findings do not, however, account for a key fact in the record: MPD officers searched the laundry room at 1817 Gainesville Street *twice*. The initial search conducted by Sergeant Kopp was a brief sweep, similar to what his body-worn camera shows him doing when searching 1811 Gainesville Street. Sergeant

---

("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."). At oral argument the government confirmed that it was not making an inevitable-discovery argument but was arguing that the discovery of the rifle was not related to Mr. James's detention and therefore was not a fruit of the stop. That clarification echoed a statement in its brief: "the inevitable-discovery doctrine 'shields illegally obtained evidence from the exclusionary rule if the government can show, by a preponderance of the evidence, that' the challenged evidence '*would* have been discovered by lawful means.' Here, however, the rifle was not 'illegally obtained'; it was instead *actually* 'discovered by lawful means.'" Br. for the United States at 34-35 n.34 (emphasis in original) (quoting *Jones*, 168 A.3d at 717). The trial court's denial of Mr. James's motion to suppress the gun was similarly based upon its conclusion that the rifle was not illegally seized in the first place.

Kopp did not seize any evidence during that search. It was Officer Roselle's subsequent more thorough search that turned up the rifle. The trial court's finding that MPD officers would have searched the laundry room of 1817 Gainesville Street as part of their sweep of the entire area explained the first search, but not the second.

The evidence admitted at the suppression hearing—particularly the body-worn camera footage—demonstrates a link between the information obtained during Mr. James's detention and the second search. On his way out of 1817 Gainesville Street after searching the building, Sergeant Kopp passed Officer Roselle, who had been questioning Mr. James. The officers' brief conversation was muffled by noise from Sergeant Kopp's radio, but Kopp can be heard telling Officer Roselle that he already searched the building. Officer Roselle still went upstairs to search again, saying, "No, no, I know he had a [unintelligible] on him." Officer Roselle then combed the laundry room and found the rifle hidden in the blue bag behind the washing machines. When Officer Roselle subsequently showed Officer Lazarus and Sergeant Kopp where he found the gun, he turned to Sergeant Kopp and said, "told you."

Sergeant Kopp and Officer Roselle later reconvened in the laundry room, and Officer Roselle can be heard on Sergeant Kopp's body-worn camera telling Kopp, "I thought you checked up here." Sergeant Kopp stated that he "missed it" and that

he was "glad [Officer Roselle] came behind [him]." Officer Roselle said that he thought the blue bag was strange, "[a]nd then [Mr. James's] story's changing, changing, changing, changing."[9] Footage from fifteen minutes later shows Officer Roselle again describing his conversation with Mr. James, stating, "Like I said his stories were changing . . . he said his friend's here, then he doesn't know where, he got locked out, then he says he don't know where he lives, he lives on Alabama . . .

---

[9] After oral argument, the government submitted a D.C. App. R. 28(k) letter stating that the trial judge may have viewed only those clips actually played during the hearing (and thus may not have viewed portions of the footage fleshing out Officer Roselle's discovery of the rifle). The letter spelled out the many hurdles the government faced in pinning down what footage was played during the suppression hearing, allowing that the "most complete list" it was able to compile might not be perfectly complete. According to the list, at least one pertinent section of the body-worn camera footage—that in which Officer Roselle is heard saying that Mr. James's "changing" story led him to search for the rifle—was not played during the hearing. And at least one of these key passages *was* played during the hearing— the interaction between Sergeant Kopp and Officer Roselle when Sergeant Kopp told Officer Roselle that he had already searched 1817 Gainesville Street and Officer Roselle replied, "No, no, I know he had a [unintelligible] on him." In any event, though we lack clear evidence about which parts of the footage were played during the hearing, what is apparent is that the government admitted the entirety of the body-worn camera footage into evidence at the suppression hearing, the government provided it to us as part of the record on appeal, and we may consider this undisputed record evidence on appeal. *See Mayo*, 315 A.3d at 617; *cf. Germany v. United States*, 984 A.2d 1217, 1221 (D.C. 2009) ("[W]e are not limited to considering the facts the court found at the conclusion of the suppression hearing; rather, '[i]n deciding whether the motion to suppress was properly denied, we may of course consider all of the evidence at the suppression hearing as well as the undisputed trial testimony.'" (quoting *Lewis v. United States*, 594 A.2d 542, 543 n.3, 546 (D.C. 1991))).

and then you know like, you saw the way he started acting."

The record does not support the government's contention and the trial court's conclusion that the second and successful search of the laundry room was unrelated to Mr. James's detention. The rifle was found shortly after police unlawfully stopped Mr. James. The officer who conducted the second search that yielded the rifle chose to follow up on Sergeant Kopp's search of the laundry room only after he had spent several minutes questioning Mr. James. After discovering the gun, Officer Roselle made multiple comments suggesting that his decision to conduct a second search and his wariness when he saw the blue bag were prompted by Mr. James's shifting responses to questioning while Mr. James was stopped.[10]

In the government's view, the information known to officers prior to the stop would have led them to search the laundry room separate and apart from Mr. James's detention. But Sergeant Kopp *did* look all around the laundry room and did not find a gun. It was Officer Roselle's second search—conducted in spite of his knowledge that the building had already been searched and brought on by his suspicion of

---

[10] "Like I said, his story kept changing," Roselle said. "I saw that [it] was folded up, and then I saw pink something, like a shirt or something right there. I saw that, and I was like 'damn' this ain't right. And then his story's changing, changing, changing, changing."

Mr. James after speaking with him—that ultimately led to the rifle.[11]

In sum, as the rifle "bear[s] a . . . close relationship to the underlying illegality," it should have been suppressed as the fruit of Mr. James's detention. *Gordon v. United States*, 120 A.3d 73, 85 (D.C. 2015) (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)). We will therefore reverse Mr. James's convictions unless the government "prove[s] beyond a reasonable doubt that the error . . . did not contribute to the verdict." *Chapman v. California*, 386 U.S. 18, 24 (1967) (stating the harmless error standard applicable to constitutional error); *see also Jones*, 168

---

[11] The government's related contention at oral argument that the bulk of Officer Roselle's questioning may have taken place before he asked Mr. James to step inside—and so the responses that made Officer Roselle suspicious of Mr. James may not have been a product of the unlawful stop—is contradicted by testimony Officer Roselle gave in the followup suppression proceeding the court held to pin down the timing of the stop. *See supra* note 3. As Officer Roselle described the onset of the encounter with Mr. James, the officer spoke with Mr. James outside for just a "minute, minute and a half" and the exchange involved introductory matters: Officer Roselle asked Mr. James his name, for example, and told Mr. James that he "looked like a suspect that was wanted in reference to a robbery." Officer Roselle did not mention Mr. James's changing story or other dodgy statements being made before the stop began. In contrast, the body-worn camera footage shows that at one point during the several minutes Officer Roselle questioned Mr. James *after* he was stopped, Mr. James could be heard telling Officer Roselle that his friend's mother lives in the building and they were there visiting her but he got locked out—one of the examples Officer Roselle mentioned as evidence that Mr. James's story kept changing. This is consistent with the government's own statement in its brief that it was "[d]uring the stop" that the "appellant told the officers he had been visiting people in the building."

A.3d at 725; *Ellis v. United States*, 941 A.2d 1042, 1048 (D.C. 2008). The government does not argue that the trial court's failure to suppress the rifle was harmless, which means we will affirm Mr. James's convictions "only when harmlessness is obvious." *See Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005) (reversing one appellant's convictions where it was "at least debatable" that the erroneous admission of hearsay testimony was not harmless and where the government was not claiming harmless error). Because the rifle was one of the most incriminating pieces of evidence against Mr. James at both trials, it is not obvious that its admission was harmless.

## III.

For the foregoing reasons, we reverse Mr. James's convictions and remand for further proceedings consistent with this opinion.

*So ordered.*