Edward E. BELL, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CO–413.

District of Columbia Court of Appeals.

Submitted April 5, 2005.

Decided April 14, 2005.

Edward E. Bell, pro se.

Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., Wyneva Johnson, and Charles Neil Floyd, Assistant United States Attorneys, filed a brief for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

PER CURIAM:

A jury convicted appellant in 1992 of felony murder, armed robbery, and a weapons offense. Evidence at trial, including the testimony of Willard Jackson ("the only government witness who directly implicated [appellant] in the crime," as the trial judge later observed), established appellant's complicity in the armed robbery of Devon Lewis ("Jamaican Mike"), in the course of which Lewis was shot to death. Appellant's convictions were affirmed on direct appeal. Before us now is an appeal from the denial of appellant's third post-conviction motion which alleged ineffective assistance of trial counsel, prosecutorial misconduct, and recantation by the government witness Jackson. The trial judge (Burgess, J.) correctly ruled that the motion was procedurally barred as to the first two contentions,[1] and similarly, that if the recantation claim were viewed as having been brought under Super. Ct. Crim. R. 33, it was time barred. The judge went on, however, to consider that claim as one asserting "new evidence" under the Innocence Protection Act, D.C.Code § 22–4131 et seq. (2004 Supp.) (the IPA or the Act). He rejected the claim after finding, on the basis of a comparison of Jackson's affidavit of recantation with the trial testimony of Jackson

---

1. No more than summary discussion of those issues is necessary here. Appellant was required to, but did not, show cause and prejudice for his failure to raise either the ineffectiveness or the misconduct issue during the pendency of his direct appeal, see Washington v. United States, 834 A.2d 899, 902 (D.C. 2003); moreover, both claims either were or could have been raised in his previous collateral attacks, and he did not pursue an appeal from the denial of either.

and other witnesses, that the recantation was not credible.

■ We affirm that aspect of the judge's ruling as well. Judge Burgess's statement of reasons for disbelieving Jackson's recantation is persuasive and supported by the record, *see* D.C.Code § 17–305(a) (2001); *Young v. United States,* 639 A.2d 92, 95 (D.C.1994) (applying "clearly erroneous" review standard to trial court's rejection of alleged newly discovered evidence as inherently incredible); we attach the relevant portions of that ruling as an appendix hereto. We publish this brief opinion only to confirm the correctness of two legal conclusions underlying the judge's rejection of the IPA claim. First, he concluded that, as in the case of a motion for new trial under Super. Ct.Crim. R. 33 alleging recantation of a government witness, a judge faced with a similar motion (but styled as one asserting "actual innocence") under the IPA may discredit the recantation by the witness and thus terminate the inquiry into the convicted person's actual innocence. Second, he concluded that, as the trial judge who had heard the testimony of Jackson and the other witnesses at trial, he was in a position to assess the credibility of the affidavit of recantation without an evidentiary hearing, in keeping with the law governing similar claims under Rule 33 or D.C.Code § 23–110. Both conclusions are correct.

■ When a convicted person moves for a new trial under Rule 33 by submitting an affidavit of a government witness purporting to recant his trial testimony, the court may decide whether the recantation is credible before turning (if necessary) to the second issue of "the effect that the recantation would have had on the jury." *Herbin v. United States,* 683 A.2d 437, 441 (D.C.1996). "If the trial court determines that the recantation is not credible, that determination ends the in-

quiry." *Id.* at 441. Moreover, at least where the same judge considering the affidavit of recantation heard the testimony of that witness and the others at trial, the judge may make the credibility finding on the basis of the affidavit and the trial record, without need for an evidentiary hearing. *Id.* at 442 (citing *Derrington v. United States,* 488 A.2d 1314, 1338–41, (D.C.1985)).

No reason exists why these same principles should not apply to a claim of recantation brought as "new evidence" amounting to proof of "actual innocence" under the IPA. In *Bouknight v. United States,* 867 A.2d 245 (D.C.2005), this court recently considered for the first time an appeal from the application of the IPA. We pointed out that the Act supplements the protections available to a convicted person under Rule 33 or D.C.Code § 23–110 by enabling the person to seek relief, without time limitation, on the basis of "new evidence," § 22–4135(a), demonstrating his "actual innocence"—meaning evidence "that the person did not commit the crime of which he or she was convicted." Section 22–4131(1); *see Bouknight,* 867 A.2d at 251–52. The Act requires the judge, in determining whether to grant relief, to consider specific statutory factors, including—of most relevance here—"[t]he new evidence" that is offered as proof of actual innocence. Only after considering these factors may the judge decide the ultimate questions of whether (a) "it is more likely than not that the movant is actually innocent of the crime" (in which case "the court shall grant a new trial") or (b) actual innocence has been shown "by clear and convincing evidence" (in which case "the court shall vacate the conviction and dismiss the relevant count with prejudice"). Section 22–4135(g)(2) & (3).

The IPA thus makes the judge the trier of fact on the ultimate issue of actual

innocence, and its explicit direction to the judge to consider "[t]he new evidence" itself as a factor in the inquiry necessarily authorizes the judge, where that evidence is a proffered recantation, to assess the credibility of the recantation before addressing other factors such as "[h]ow the new evidence demonstrates actual innocence," § 22–4135(g)(1)(B), or "[w]hy the new evidence is or is not cumulative or impeaching." Section 22–4135(g)(1)(C). In other words, if the judge reasonably finds the recantation to be not credible, that determination properly "ends the inquiry," *Herbin, supra,* into whether the movant has met his burden of showing that he was in fact innocent. Furthermore, there is no reason why, as in the case of a motion for new trial, the credibility finding as to the recantation cannot be made without an evidentiary hearing by a trial judge who heard the testimony of the recanter and other witnesses at trial. The standard for when a hearing must be held under the IPA, *see* D.C.Code § 22–4135(e)(1), mirrors exactly the standard for a hearing required by D.C.Code § 23–110, thus making applicable cases such as *Derrington, supra,* which commit the decision on whether to hold a post-conviction hearing to the sound discretion of the judge in cases of asserted witness recantation.

■ Judge Burgess did not err in concluding that, as the judge who had presided over the trial, he was well situated to decide the credibility of the recanting affidavit without a hearing. *See United States v. Kearney,* 220 U.S.App. D.C. 379, 384–86, 682 F.2d 214, 219–21 (1982) (because the trial judge had "watched the case against [appellant] and the other [defendants] unfold from day to day," he "was exceptionally well qualified to pass on the affidavits"). Further, for the reasons stated in the portions of the judge's opinion attached hereto, his decision to discredit Willard Jackson's affidavit—thereby obviating the need for further consideration of appellant's claim—is well supported by the record.

*Affirmed.*

### APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CRIMINAL DIVISION

UNITED STATES OF AMERICA

v.

EDWARD BELL

Case No. F8313–91

### MEMORANDUM AND ORDER

This case is before the Court on the defendant's Motion to Vacate, or Set Aside Convictions pursuant to D.C.Code § 23–110 (2001).

Defendant ... presents an affidavit of the only government witness who directly implicated him in the crime. The affidavit recants the witness's trial testimony.... The Court denied the motion based on the recantation because the motion was really a new trial motion under Super. Ct.Crim. R. 33, based on newly discovered evidence, and was untimely. The Court noted, however, that the defendant may have made out a claim under the Innocence Protection Act, D.C.Code § 22–4131 *et seq.* (2003 Supp.), and ordered a response from the government. The government complied, and the defendant has filed a response to the government's pleading.

\*    \*    \*    \*    \*    \*

The issue is whether the Court is "reasonably well satisfied that the prior testimony was false." *Derrington* [*v. United States*], 488 A.2d [1314,] 1339 [D.C.1984 (citation omitted)]. In order to make that determination, the Court first reviews

Jackson's trial testimony, and then the affidavit.

Jackson testified that on the night of the murder he was in the lobby of his apartment building speaking to "Jamaican Mike," the victim. He saw defendant Bell, and his co-defendants, Frazier, Stewart and Hampton, outside the building. He knew each of them well, and, in fact, considered Bell his cousin, though they were not related by blood. He considered Hampton his best friend and had known Stewart and Frazier for years. Jackson spoke to the men outside the building, asking, "[W]hat y'all up to"? They asked Jackson where Mike kept his drugs and Frazier said they were going to rob Mike and "smoke his ass." Jackson went back into the building. He then saw Hampton and Frazier coming in from the side of the building, with masks on, "flashing guns" and telling everybody to get out. Jackson got his coat and left. He saw Bell and Stewart come in as he left. As he went down the steps he turned around and saw Hampton hold a gun to Mike's head as Frazier and Bell [were] "going through his pants and clothes" with his pants unfastened. Jackson went across the street.[1] He saw Bell and Stewart come down the steps and heard three shots. Frazier and Hampton ran out the side of the building. Jackson testified that he saw Bell with a sawed-off shotgun as he came into the building.

On February 13, 1991 (some three weeks after the crime), Jackson gave a written, six-page statement to the police describing the shooting. He implicated Frazier and Stewart, but not Bell and Hampton. He explained at trial that he did not implicate Hampton because Hampton was his "best friend," and did not implicate Bell because "[h]e was closer to me than any of the other guys." He later implicated Bell because he "wanted to tell the truth and . . . didn't feel as though [he] should give up one guy and didn't give them all up." Jackson testified that he had talked to the police the night of the murder and did not indicate Bell's involvement because he "didn't want to give him up so easy. [I] was protecting at first."

Jackson has now filed an affidavit declaring that the "the testimony [he] gave before the court was false." He avers that he was "not present at 1835 3rd Street, N.W. during the alleged robbery and shooting of Devon Lewis," and has "no direct knowledge of who may or may not have been involved in that offense." He states that "[t]he only knowledge [he has] or ever had of the robbery and murder of Devon Lewis is what [he has] heard from other people who claim to have seen the incident and what [he] learned during conversations with police and representatives of the United States Attorney's office."

Jackson also explains that he implicated Bell because the investigating detective, Detective Jefferson, "threatened to charge [him] unless [he] told him something he could use." He thus falsely implicated Bell to take the pressure off of himself. Jackson states that he did not tell the truth before trial and at trial because the police were giving him money and "moving [him] between various places." He used the money to buy cocaine. He feared that if he told the truth the police would no longer give him money. He also testified falsely because he had a pending cocaine distribution charge and felt that if he coop-

---

1. Jackson first said that he saw the men frisking Mike while he, Jackson, stood across the street. He then said he saw them frisk Mike when he turned around as he went down the steps. The two statements are not necessarily inconsistent, as he well could have first seen them as he went down the steps and continued to see them as he stood across the street.

erated he would gain favor with the United States Attorney's office and avoid prison. He felt that, because he had already given testimony at the trial of one of the co-defendants, he would be prosecuted for perjury if he changed his testimony. He has come forward with the truth now "because [h]e is no longer on drugs and [he] want[s] to straighten out [his] life and rectify the mistakes that [he] made in the past including the lies that [he] told against Bell and the others in this case."

The Court has reviewed the trial testimony of all the witnesses. The Court is not "reasonably well satisfied that [Jackson's] prior testimony is false," for the reasons stated hereafter. [Footnote omitted.]

Jackson's testimony is corroborated by Alexander Short. Short testified that he saw four or five men come up to a corner near the building in a Red Cherokee. He recognized two of them, Frazier and Hampton, whom he knew. The men put on hoods and began "scoping the building out." Short went into the building and was in the hallway when he heard, "This is a stickup, give me all the coke." Then he heard gunshots. Short provides strong circumstantial evidence that the men he saw get out of the Cherokee and "scoping the building out" were the same men involved in the robbery and killing. Two of these men were Frazier and Hampton.

Jackson testified at trial that Frazier and Hampton, whom he knew well, were involved in the crime. While he now says that he lied on that as well as other points, knowing nothing of his own personal knowledge about the crime, his testimony corroborates and is corroborated by Short on the identity of Frazier and Hampton.

Jackson's testimony is also corroborated by the testimony of Mary Ann Davis. She testified that she bought cocaine from "Jamaican Mike" and as she left the building, she saw in an alley beside the building Michael Stewart, whom she had known for ten years. He had a gun. She asked him what he was doing and he said, " 'Don't call my name.' " He walked to the corner of 3rd and Seaton and then heard three shots, within seconds of the time she saw Stewart. Davis' testimony also provides circumstantial evidence of Stewart's involvement in the crime, and corroborates and is corroborated by Jackson's trial testimony on the identity of Stewart.

Jackson's testimony is also partially corroborated by the testimony of his own witness, Karen London. She identified Hampton as one of two men who came into the lobby from the side entrance and committed the robbery. Although London said that Bell was not present, she corroborates Jackson on his identification of Hampton and his testimony that Hampton came in from the side.

Thus, Jackson's testimony as to the identity of all the defendants but Bell is corroborated by other witnesses. If the reliability of Jackson's recantation involved only the issue of Bell's identity as one of the perpetrators, the corroboration would have little force. Jackson's recantation, however, is a recantation as to all of the defendants. He says he has no personal knowledge of the crime at all. The corroboration from the other witnesses thus undermines the credibility of the recantation.

Jackson's affidavit could be said to diminish the force of the corroboration because, in it, Jackson states that the only knowledge he has of "the robbery and murder of Devon Lewis is what [he has] heard from other people who claimed to have seen the incident and from what he learned during conversations with police and representatives of the United States Attorney's office." Arguably, the corrobo-

ration is not significant if Jackson could have gotten all of his information about the crime from others, including the police.

Jackson's brother, Marcus Ballou, testified for [Bell] at the trial and gave evidence that contradicts Jackson's present assertion that the only information he has about the crime comes from others. Ballou testified that, just hours after the crime, he saw Jackson at the building where the crime occurred. Ballou asked him "what had happened ... did he see anything." Jackson responded that he did not, but that "when he was exiting the building, coming out, he said two guys were coming in and one was wearing a mask." If his own brother and witness is to be believed, Jackson did have personal knowledge of the robbery and murder, at least to the extent of having witnessed two of the perpetrators entering the building.

Moreover, Jackson testified to one detail about the crime that plausibly could come only from his own knowledge. He testified that he had a conversation with the four perpetrators in which they asked where Mike kept his drugs, and Frazier said they were going to rob him and "smoke" him. While there was evidence that others were present who could have seen and did see the actual robbery and shooting, and provided their information to Jackson, it is highly implausible that someone relying solely on information from others would provide Jackson detail about a conversation with the perpetrators in which they stated they were going to rob and kill the decedent, and that Jackson would then place himself in this conversation.[2]

Jackson states that he first heard Bell's name mentioned when he was interviewed by Detectives Jefferson and Jones. He states that he told the detectives that he did not know who was involved in the murder. Jefferson then told him that they had stopped Bell in the truck used in the murder and believed Jackson had knowledge of the murder. Jackson then falsely implicated Bell because Jefferson threatened to charge him with murder "unless I told him something that he could use."

This statement cannot be reconciled with the fact that, three weeks after the crime, Jackson gave a six-page statement describing the crime and implicating Stewart and Frazier. If Jackson first heard Bell's name from Jefferson at this interview, he did not implicate Bell in the interview and he did tell the detectives that he knew about the crime. Indeed, he gave a six-page statement about it. If Jackson first heard Bell's name from Jefferson before the February 13 interview, he did not implicate Bell in the interview, because Bell was implicated after the February 13 statement was given. If he first heard Jefferson's statement about Bell after the February 13 interview, his affidavit stating that he said he did not know who was involved is obviously incorrect, because he had already, in his February 13 statement, disclosed his knowledge of the crimes, withholding only the names of Bell and Hampton.

Jackson's affidavit simply does not account for the fact that, three weeks after the crime, he implicated some but not all of the defendants. He does say that his pending charge influenced him to give false information, but the Court is unconvinced that this charge, without any prom-

2. Of course, the police could not have known of the conversation directly. It is conceivable that they could have learned it from one of the co-defendants. But the only statement of a co-defendant was that of Hampton, which did not report this conversation. *See* defendant's Motion for Severance, para. 3.

ises by the government, would plausibly have caused him falsely to implicate two people whom he knew well in the crime, while not implicating Bell and Hampton. The "pressure" he says he felt is ascribed to Detective Jefferson's need to charge Bell, but Jackson does not explain why he implicated Frazier and Hampton. If he truthfully implicated them, then his knowledge of the crime is personal knowledge, and his affidavit to the contrary is incredible.

For the foregoing reasons, and having heard Jackson's testimony at trial, the Court concludes that the recantation is not credible and that the trial testimony is credible.

\* \* \* \* \* \*

SIGNED IN CHAMBERS
/s/ A. Franklin Burgess, Jr., Judge
**April 6, 2004**