**Walter O. JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 04–CF–1125, 09–CO–597.**

District of Columbia Court of Appeals.

Argued March 1, 2011.

Reargued Oct. 5, 2011.

Decided Dec. 22, 2011.

Alice Wang, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman and David Gorman, Assistant United States Attorneys, were on the brief, for appellee.

Before OBERLY, Associate Judge, and NEWMAN, Senior Judge,* and REID, Senior Judge.**

NEWMAN, Senior Judge:

A jury found Johnson guilty of murder of a law enforcement officer while armed, aggravated first-degree murder while armed, and related other offenses, all stemming from the shooting death of Metro Transit Police Officer Marlon Morales while on duty inside the U Street Metro station in Northwest D.C. on June 10, 2001. In these consolidated appeals, Johnson challenges, on Fourth Amendment grounds, the denial of his motion to suppress Officer Morales' service weapon (and his statements relating thereto), which police seized from Johnson during a traffic stop and frisk in Philadelphia four days after Morales was shot. He also contests the trial court's denial of his motion for a new trial based on newly discovered evidence in the form of an alleged recantation by a government witness. We hold that the trial court correctly analyzed the evidence and the law relating to the seizure and that the suppression motion was properly denied because the Philadelphia police acquired articulable reason to suspect that Johnson might be armed and pose a danger to their safety before the frisk occurred. Because we also find that the court did not erroneously exercise its discretion in denying the motion for a new trial, we affirm.

## I.

### A.

At the suppression hearing, the government presented the testimony of two Phil-

* Senior Judge Newman replaced Associate Judge Kramer on the division following Judge Kramer's retirement on May 1, 2011.

** Judge Reid was an Associate Judge of the court at the time of argument. At the time of reargument, her status was Associate Judge, Retired. Her status changed to Senior Judge on December 12, 2011.

adelphia police officers, Michael Harvey and Lisa Heil. While on motor patrol in Northwest Philadelphia, Officer Harvey observed Johnson driving an Oldsmobile with an expired inspection sticker. Using the overhead lights and siren on his marked police car, Officer Harvey signaled to the driver to stop, but saw that he appeared reluctant to comply and was "very nervous," looking "to his left, his right" and "over his shoulders," not "like he was going to stop." When two other police cars pulled into the street ahead of Johnson, however, he stopped the Oldsmobile and opened the driver's door. Officer Harvey ordered him to close the door and stay in the car, then approached and asked for his driver's license and registration. Johnson retrieved a registration from the glove box but stated that "he did not have a driver's license, that he was out running an errand to pick up diapers for . . . his baby's mother." He appeared "hyper" to Officer Harvey, "moving around a lot in the vehicle" and saying that "he was on his way home from getting diapers and . . . had to get these diapers home." Officer Harvey "saw no diapers within the vehicle." He radioed a stop report to the police dispatcher describing the car and tag number. While doing so he noticed Johnson again open the car door to exit, and he again ordered him to stay inside the vehicle.

At that point two backup officers, including Officer Heil, arrived on the scene, and simultaneously a report came over the police radio stating that the car was in a "try and locate status." Officers Harvey and Heil both testified what this meant and required of them under Philadelphia police practice. According to Officer Harvey, a "try and locate" vehicle is one that has been:

taken by somebody that the owner knows. It's not necessarily a stolen vehicle, but it's taken by someone that the owner knows and the owner wants the vehicle back. After so many days, the vehicle's supposed to be put in the system as stolen, but due to the volume of cars that are in "try and locate" status, a lot of times they're not updated as stolen cars.

Once a car is known to be in this status, Officer Harvey explained, the police "remove the driver from the vehicle and recover the vehicle for the owner. . . . We attempt to either contact the owner and have them pick it up at the location, or we have the vehicle towed to a secure location and then the owner can pick [it] up from there." When a car is in the "try and locate" status, Officer Harvey continued, both the car and the driver "get[ ] investigated." "[A]s far as vehicle investigations . . . you . . . run the tags, confirm valid registration, whether the car is in stolen status or not whether it's a felony vehicle. . . . [A]lso, the operator. You have to make sure there's no [']wants['] and that he has a good license." The need to investigate the driver was heightened, Officer Harvey added, "because of the totality of all the circumstances," the fact that he "didn't have an ID on him," his suspicious statement about the diapers, and "his movements throughout the . . . car stop." Thus, when the report came back on the "try and locate" status of the car, Officer Harvey decided that he needed to clarify "who [Johnson] was at that point . . . [a]nd until I was able to run him, either through BMV [Bureau of Motor Vehicles] to find out if he had a license or whatever or an ID card," he was going to be detained on the scene.[1] Officer Heil's similar under-

1. Officer Harvey's answer just quoted was in response to defense counsel's question: "And

when you had learned about the 'try and locate' status you were going to just hold Mr.

standing was that, given the combination of the "try and locate" report—a status akin to but not the same as "reporting [the vehicle] stolen"—and Johnson's failure to have a driver's license or "proof of who he [was]," the police were authorized to "detain him and even take him in for investigation."

The officers therefore ordered Johnson out of the car and attempted to position him against the rear of the Oldsmobile to create some space between the vehicle and the front of Johnson's body to be able to pat him down. Shortly thereafter, however, Johnson resisted placing his hands against the car and moved one of them down to his waist or thigh area, an action he immediately repeated. Attempting to restrain him, Officer Harvey looked down and saw that Johnson was grabbing the handle of a gun sticking out of his left pant leg. After an intense struggle involving Johnson and the three police officers (as well as an off duty officer who fortuitously arrived on the scene), the officers seized the gun, subdued and arrested Johnson.

## B.

Based upon these facts, Judge Keary found that, although Johnson had been stopped for a traffic violation, the circumstances gave them reason to suspect that his involvement with the Oldsmobile was criminal in nature and that he might be armed. Crediting Officer Harvey's testimony in particular, she found that when the car was reported missing and in the "try and locate" status, he had reason to suspect that "the car m[ight] be stolen," and thus that further detention of Johnson on the scene would be necessary:

> [I]n such a scenario, [the judge found,] the record reflects that a driver must be investigated. He cannot leave the

Johnson until the owner of the car came on

scene.... [I]n Mr. Johnson's case, the police ... had very little information on him.... [T]hey know he has no license, no identification to reflect a name. Clearly, they have grounds to detain him further to conduct some limited investigation.

And, Judge Keary reasoned, this need for continued immediate contact with Johnson during the investigation prompted a reasonable concern for the officer's safety, given Johnson's entire behavior:

> First, [Johnson] was hesitant about pulling over, initially, and did not immediately pull over in response to the sirens and the lights.
>
> Second, [Johnson] was looking around, behind and to the side of him, and showed signs of nervousness or hypervigilance.
>
> Third, [Johnson] tried to exit his vehicle while Officer Harvey was still inside his, having just stopped; and had to be told by Officer Harvey not to get out, and to stay in the car, with the door closed.
>
> Fourth, having been told once not to get out of the car, [Johnson] later tried again to exit the vehicle, and had to again be told to stay in the car; factors which the officer certainly found suspicious and of concern....
>
> Fifth, when Officer Harvey talks to [Johnson], [Johnson] gives a name which is false—although Officer Harvey certainly does not know that at that point—and seems somewhat nervous, and like he did not want to be detained for very long, and did not wish to be delayed.
>
> Sixth, [Johnson] had no license.
>
> Seventh, [Johnson] gave an explanation of being on his way home from an errand to get diapers, but Officer Harvey saw none in the car.

the scene"?

Eighth, Officer Harvey describes [Johnson] as being hyper, and moving around a lot in the vehicle.

And lastly, the vehicle is reported to be in "tried to locate" status, which means that the car may be stolen[.]

Judge Keary then listed the following factors as justifying the officer's frisk due to safety concerns:

[Johnson] is behaving in a suspicious fashion: First, having not immediately stopped his vehicle in response to the police sirens; then two times having tried to exit the vehicle, even after having been told once not to; also driving without a license; also saying that he has bought diapers when none can be seen in the car; and then having in his possession a vehicle which has apparently been taken without permission, or without continued permission to have the vehicle.

Lastly, [Johnson] is noted to be very nervous, hyper, and moving around a lot in the vehicle.

When this person is taken out of the car ... by Officer Harvey, and is just a couple of feet away from the officer, face-to-face, it is clearly reasonable for Officer Harvey to fear for his safety.... While there are two other officers there, he is the only one close to [Johnson]; and he is actually very physically close to [Johnson]. None of the others, including Officer Harvey, has their weapons drawn, or is in any other way prepared to intervene if [Johnson] should pull a weapon, or do anything else of a physically-aggressive nature.

. . . .

I conclude, on the basis of the totality of circumstances here, as testified by the witnesses, that a frisk was warranted for the officers' protection.

## II.

■ We begin our discussion with what is not at issue on this appeal. Johnson does not dispute that the police had reason to stop his car and order him to step out of it. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (holding that where a police officer observes expired automobile tags, it is reasonable and comports with the Fourth Amendment for the officer to order the driver out of the car, even absent a suspicion of foul play). Nor does he question their authority to detain him at the scene for some appreciable length of time while they clarified his relation to the car and, indeed, determined who he was (because he had no driver's license or other written identification). Further, he concedes that once he disobeyed the order to keep his hands on the car and instead (twice) moved his hand down to his waist or upper-thigh area, the police had an objectively reasonable suspicion that he might be reaching for a weapon and could frisk his person.

It is what took place in-between—between the stop and Johnson's threatening downward movement—that divides the parties. Johnson argues that nothing the police observed before they laid hands on him and ordered him to "assume the position" against the car justified the intrusion of a patdown or frisk (we hereafter use the two words interchangeably). The government, for its part, poses the initial question of whether a frisk had even begun before Johnson made the tell-tale movement of his hand toward his waist and undeniably invited a further search. The government argues that there is no justification for treating a mere decision by the police to frisk, even followed by a verbal order to the suspect to assume the frisk position, as the commencement of the actual patdown.

One can cogently argue that it makes little conceptual sense to regard a frisk—by definition the physical act of running one's hands over a person's body—as having begun before the police begin to pat down the exterior of a person's body. *See People v. Batista*, 88 N.Y.2d 650, 649 N.Y.S.2d 356, 672 N.E.2d 581, 583 (1996) (defining a "frisk" as a "pat down of the outer clothing of a suspect"); OR.REV.STAT. § 131.605(3) (2011) (defining frisk as "an external patting of a person's outer clothing."). *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 912 (2002) (defining "frisk" to mean "to search or go through ... for concealed weapons or stolen articles ... by running the hand rapidly over the clothing and through the pockets"). Indeed, one may ask whether taking hold of a person by the elbow or shoulder to move him into a better position for a frisk is functionally—or legally—part of the patdown itself, rather than of the antecedent detention leading to a frisk. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[T]he right to make an ... investigatory stop necessarily carries with it the right to use some degree of physical coercion...."); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (investigatory stop upheld although officer physically grabbed defendant and moved him to sidewalk).

■ Both parties correctly conceded at oral argument that the question of "when a frisk commences" is a question of law. *See United States v. Santos*, 403 F.3d 1120, 1124–25 (10th Cir.2005) (analyzing extensively the standard of review that applies

to various types of findings made by trial court at a suppression hearing); *Jackson v. United States*, 805 A.2d 979, 983–85 (D.C.2002) (when "seizure" occurs is a question of law). Counsel for Johnson urged at oral argument that as a matter of law, the frisk commenced in this case when he was ordered to "assume the position" against the car. She stated that this result was mandated by our decisions in *James v. United States*, 829 A.2d 963 (D.C. 2003); *Jackson*, 805 A.2d at 979; and *Powell v. United States*, 649 A.2d 1082 (D.C. 1994); These cases do not support her claim.[2] We need not further explore (or decide) this issue to resolve this appeal, however, because we conclude that the evidence and the law support Judge Keary's ruling that when Officer Harvey ordered Johnson to assume the position for the body frisk, the officer reasonably suspected that he might be armed and a danger to his safety, hence justifying the patdown.

■ Our measure of review in this area is well understood. While this court reviews *de novo* the trial court's conclusion that reasonable grounds for a frisk existed, we must view "the facts and all reasonable inferences therefrom ... in favor of sustaining the trial court's ruling." *Singleton v. United States*, 998 A.2d 295, 299 (D.C. 2010). Because a frisk of a person is "an intermediate response," *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (stating that intermediate responses, such as "limited protective search[es] for concealed weapons," are permissible under *Terry* during

**2.** *James* deals with the issue of whether or not there was a constitutionally valid basis for the search of an automobile incident to a *Terry* stop, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), not the frisk of a person. *Jackson* deals with the issue of when a seizure occurred pursuant to *Terry*, not

when a frisk commenced. And *Powell* deals with whether reasonable grounds under *Terry* existed for the frisk, not when the frisk commenced. Our research discloses no decision of this court deciding the question of "when a frisk commences."

the course of a "reasonable investigatory stop[s]"), between contact with a citizen that entails no Fourth Amendment seizure and "the full field-type search" permitted incident to a valid arrest, *Knowles v. Iowa,* 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), only reason to suspect that the person *may* be armed—not reason to believe he *is* armed—is necessary to justify the frisk. *See generally Arizona v. Johnson,* 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ("[A] driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'"); *see also James v. United States,* 829 A.2d 963, 966 (D.C.2003) ("An articulable suspicion is 'substantially less than probable cause'...."); *Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991) ("The requirement of 'articulable suspicion' is not an onerous one.").

■ We are mindful that when considering whether the totality of the circumstances gives rise to an articulable suspicion, we do so "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Singleton,* 998 A.2d at 300 (quoting *(Antonio) Green v. United States,* 662 A.2d 1388, 1390 (D.C.1995)). Moreover, the issue is not whether Officer Harvey himself subjectively harbored a suspicion that Johnson was armed, but whether a reasonable officer in the circumstances would have harbored such a suspicion. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") (quoting *Scott v. United States,* 436 U.S. 128, 136, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)) (internal quotations omitted).

As Judge Keary found, even before the police acquired reason to suspect that Johnson's possession of the Oldsmobile might be criminal, his actions and the situation had put the officers on guard. During the police pursuit Johnson seemed reluctant to stop his car and appeared "hyper"-nervous. Once he stopped the car, he twice tried to step out of it despite orders to remain inside. Further, he had no license to drive a motor vehicle and, seemingly to excuse that fact, told the police that he was en route home from an emergency trip to buy diapers, a fact of which the police saw no visible evidence in the car.

We need not determine whether, at this point, the constitutional strictures of *Terry* and its progeny had been satisfied,[3] for

---

3. *Compare United States v. Shranklen,* 315 F.3d 959, 961 (8th Cir.2003) ("The reasonableness of a search for weapons at an investigative stop, however, does not turn on actual knowledge ... [but rather] the 'specific and articulable facts' and the inferences that arise from those facts."); *United States v. Murphy,* 261 F.3d 741, 743 (8th Cir.2001) (stating that a search is proper where the collective circumstances, such as a lack of identification and out-of-state license plates, "amount to unusual conduct" in the eyes of a reasonable officer, giving rise to the belief that the individual "might have been engaged in a crime and might pose a danger to a law enforcement officer's safety"); *James,* 829 A.2d at 966 ("[A]ppellant's [furtive] movements, when considered together with his failure to stop immediately, the nature of the neighborhood as a high crime area, and [the officer's] experience, raised a reasonable suspicion in the officer's mind that appellant had a gun."); *with Powell,* 649 A.2d at 1089 ("[A] routine traffic violation, coupled with a slight hesitance on the part of the motorist does not establish reasonable suspicion that a person is armed and dangerous.").

then the police learned of the "try and locate" status of the Oldsmobile. Judge Keary found that Johnson was driving a vehicle without the owner's present permission, and that the vehicle was possibly even stolen, and the record supports that finding. After an indefinite number of days, according to Officer Harvey, a car designated "try and locate" is to be regarded—"put in the system"—as stolen, although police records often failed to be updated to reflect that change. Consequently, while the officers had no reason to *believe* that Johnson was engaged in more than the unauthorized use of a motor vehicle, a misdemeanor under Pennsylvania law[4] for which they did not intend to arrest him, they had reason to *suspect* that his possession was felonious.[5] This, together with the circumstances described above, cast a different and potentially more dangerous light on what was the further—and potentially lengthy—need for the police to keep him in their presence while they investigated his identity and connection with the car.

█ The police, in short, were not obliged to take the risk that a person potentially subject to arrest for felony theft had on his person the means—a weapon—of preventing his apprehension for a serious crime. *See United States v.*

*Murphy,* 261 F.3d at 743 (finding frisk of driver permissible where police knew the driver was not the owner of an out-of-area car—he was a male, while the car registrant was a female—and he had no driver's license, meaning that the officer "had no way to determine the identity of the person with whom he was dealing and whether [the person] was a criminal and might be dangerous."); *Powell,* 649 A.2d at 1090–91 n. 5 (Farrell, J., concurring) (distinguishing the lead opinion in *Powell,* where the police had observed only an "ambiguous movement" and nervousness on the part of a person stopped for a traffic violation, from a hypothetical case where the person was suspected of a more serious offense, in that his actions "bespoke someone, for example, engaged in possession of a stolen vehicle").[6] *See also State v. Cowart,* 862 So.2d 225, 231–32 (La.Ct.App. 2003) (concluding that police reasonably believed a suspect may be armed during a traffic stop for driving with an expired inspection sticker because the suspect "was pacing back and forth" and "failed to produce a driver's license or identification").[7]

We agree with the view expressed by the Court of Appeals of New York in *People v. Rivera,* 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d 32, 35 (1964) and

---

**4.** *See* 18 Pa. Cons.Stat. § 3928 (1990) (misdemeanor unauthorized use of automobiles and other vehicles); 18 Pa. Cons.Stat. § 1104(2) (1990) (misdemeanor punishable by up to two years in prison). If the search had occurred in the District of Columbia, it could have been based on probable cause of a felony unauthorized use of a vehicle. D.C.Code § 22–3215 (2001).

**5.** *See* 18 Pa. Cons.Stat. § 3921(a) (theft by unlawful taking of movable property); 18 Pa. Cons.Stat. § 1103 (1990) (punishable by up to seven years in prison).

**6.** As we said in *James,* 829 A.2d at 969: "*Powell* [is] of minimal precedential value be-

cause of its failure to command a majority opinion."

**7.** Johnson urges that each of the facts on which Judge Keary relied has an exculpatory explanation, thus negating legal justification for the frisk. However "the totality of the circumstances in each particular case means that even a series of acts innocent in themselves may give rise to a reasonable suspicion of criminal activity when taken together." *United States v. Hanlon,* 401 F.3d 926, 929 (8th Cir.2005). *See United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

quoted by the court in *Batista*, 649 N.Y.S.2d 356, 672 N.E.2d at 583:

> If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimize that danger.

Viewing the concatenation of circumstances in their totality, as we must, *Singleton*, 998 A.2d at 300, and "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *id.*, we agree with Judge Keary that the police had "more than a mere 'hunch' or 'gut feeling' " that Johnson might be armed, *James*, 829 A.2d at 966, and were justified in adopting the "intermediate response," *Adams*, 407 U.S. at 145–46, 92 S.Ct. 1921, of patting him down while they sought to dispel their reasonable suspicion that he might be in possession of a stolen car. We hold that Judge Keary correctly denied the motion to suppress for the reasons she stated.

### III.

Johnson argues separately that the trial judge erroneously denied his motion for a new trial based on recantation by a trial witness against him, Ethan Means. The judge denied the motion because, in her view, Means's post-trial statements did not contradict his trial testimony and, in any event, she did not credit his post-trial statements. Johnson argues that the judge failed to appreciate the significance of Means's purported recantation, i.e., that while Means did not specifically renounce

the truth of his prior identification of Johnson as the shooter in a related crime,[8] Means did recant as to the *certainty* of his identification. We find no abuse of discretion in the judge's denial of the motion.

### A.

■ To understand the issue, we must first summarize briefly Means's role as a witness against Johnson. According to the government's proof, on the day Johnson shot and killed Officer Morales, he traveled to Philadelphia, and four days before the police arrested him there in possession of Morales's service revolver, he shot and wounded Means using the same gun he had used to kill Morales. According to Means's trial testimony, he and a friend, Reynolds, had been planning to spend the evening of June 6, 2001, selling drugs from an apartment Reynolds rented. They bought some food, and on their way back to the apartment were approached by Johnson, who offered to exchange five dollars for a ride. Reynolds agreed, and Johnson went to Reynolds's apartment with Reynolds and Means. After ten minutes in the apartment, Johnson left, after which Reynolds too left, leaving Means alone in the apartment.

Twenty minutes later, Means heard a knock at the door. When he opened the door, Johnson appeared, forced him into the apartment, and shot him in the face. After taking Means's money, Johnson left, and Means escaped to find help. After being released from the hospital, he told Reynolds that Johnson, the man they had picked up that evening, was the one who shot him. Both Means and Reynolds later identified Johnson in a photo lineup as the man to whom they gave a ride on June 6th. Both men also identified Johnson in

---

8. *See* discussion *infra,* at III. A.

court, where Means specifically identified him as the man who shot him in the face.

Following his conviction in the present case, Johnson was tried in Pennsylvania for attempting to kill Means. The Commonwealth did not call Means as a witness, and Johnson was thereafter acquitted. Johnson thereafter filed a motion for a new trial in the District of Columbia, contending that, at his preliminary hearing in Pennsylvania, Means recanted his trial testimony and this "recantation" constituted newly discovered evidence that probably would produce an acquittal in a new trial. The government argued that Means did not recant but, instead, merely attested to a present failure of memory that, in any event, was not credible.

Judge Keary rejected Johnson's request for a new trial. After comparing Means's District of Columbia trial testimony with his Pennsylvania-hearing testimony, she ruled that Means had not recanted his trial testimony and, in any event, that his post-trial statements were not credible "when examined within the totality of the circumstances surrounding his testimony."

▉▉▉ This court reviews a decision to deny a new trial based on newly discovered evidence for abuse of discretion. *Herbin v. United States*, 683 A.2d 437, 442 (D.C.1996) (citation omitted); *Johnson v. United States*, 398 A.2d 354 (D.C.1979). Where the denial is reasonable and supported by the record, reversal is not warranted. *Herbin*, 683 A.2d at 442. Where the motion is based on the recantation of a witness, "the trial court first determines the credibility of the recantation and that witness's trial testimony." *Id.* 441 (citation omitted). "If the trial court determines that the recantation is not credible, that determination ends the inquiry." *Id.*

Johnson's argument that Means recanted the certainty of his identification rests on the predicate that his preliminary hearing testimony in Philadelphia was truthful and credible. The trial judge, however, was not bound to credit Means's preliminary hearing testimony, and she expressly chose not to do so. Rather than finding that testimony credible, she rejected it as contrary to what she found to be his truthful trial testimony in the present case. This determination was well within her authority. "Recanting affidavits and witnesses are looked upon with the 'utmost suspicion....' " *United States v. Kearney*, 220 U.S.App. D.C. 379, 384, 682 F.2d 214, 219 (1982) (citation omitted); *accord Godfrey v. United States*, 454 A.2d 293, 300 n. 26 (D.C.1982). The judge discredited Means's recantation because it was equivocal, if not wholly evasive, especially when compared to his detailed and thorough trial testimony, which had been thoroughly tested on cross-examination. Means's trial testimony was also corroborated by Reynolds, who testified at the Philadelphia trial consistently with his testimony in this case. The judge's reasoning was "persuasive and supported by the record," *Bell v. United States*, 871 A.2d 1199, 1201 (D.C.2005), and she was well-positioned to assess the credibility of a recantation based on the affidavit and trial record without holding a hearing. In short, her finding that Means's recantation was not credible "ends the inquiry." *Herbin*, 683 A.2d at 441.

*Affirmed.*

OBERLY, Associate Judge, dissenting:

I respectfully dissent. I would hold that the trial court erred by denying Johnson's motion to suppress, and, because the erroneously admitted evidence was not harmless beyond a reasonable doubt, I would reverse and remand for a new trial.[1]

---

1. Because I would dispose of the appeal
based on the suppression motion, I do not

The central question in this case is whether the Philadelphia police had reasonable, articulable suspicion to believe that Johnson "might be armed and pose a danger to their safety before the frisk occurred." Maj. Op. 363. The majority holds that they did. *Id.* To analyze the correctness of the majority's conclusion, I first consider when the frisk commenced and then assess what facts were known to the officers at that time.

## I.

When did the frisk begin? I agree with the majority that no decision of this court has decided the question of "when a frisk commences." And I agree with the majority that we decide that question as a matter of law. Thus, we must look elsewhere as we apply our own logic and experience to the cases that touch upon the issue. The majority relies on a New York case,[2] an Oregon statute,[3] and a dictionary[4] to conclude that "it makes little conceptual sense to regard a frisk ... as having begun before the police begin to pat down the exterior of a person's body." Maj. Op. 367. In the very same paragraph, however, the majority, citing two cases from the Supreme Court of the United States,[5] cogently observes that "one may ask whether taking hold of a person by the elbow or shoulder to move him into a better position for a frisk is functionally—or legally—part of the patdown itself, rather than of the antecedent detention leading to a frisk." *Id.* It is hard to imagine how it is not. We are splitting hairs much too finely if we pretend that an officer who necessarily

touches a suspect to move him into position for a frisk has not thereby commenced the frisk, even though the actual "patdown" of the suspect's clothing does not occur until seconds or minutes later, after the officer has "positioned" the suspect by moving him to the spot where he wants him to be. Common sense dictates that the frisk is one continuous event that begins, at the latest, when the officer physically moves a suspect into position for a patdown, and it is logically inseparable from the patdown itself. As the government urged at oral argument, "a frisk has to be *intentional touching for the purpose of locating a weapon.*" To say that the "intentional touching" does not include positioning the suspect is nonsensical, and none of the authorities cited by the majority (from New York, Oregon, or the dictionary) hold to the contrary. Rather, each defines that portion of a frisk that includes the patdown of the suspect's outer clothing, but none states that the frisk cannot, as a matter of law, begin earlier. I would hold, as a matter of law, that the frisk in this case began when Officer Harvey moved Johnson into position.

The record in this case amply supports the conclusion that the initial touching of Johnson was part and parcel of the frisk. The touching of Johnson was not necessary to prevent his escape or to preserve the safety of the officers during the investigation; rather, its sole purpose was to effectuate the frisk. Had Officer Harvey actually felt a weapon while manipulating Johnson into position, I would have no

address whether or not the trial court abused its discretion in denying the motion for a new trial.

**2.** *People v. Batista,* 88 N.Y.2d 650, 649 N.Y.S.2d 356, 672 N.E.2d 581, 583 (1996).

**3.** Or.Rev.Stat. § 131.605(3) (2011).

**4.** Webster's Third New International Dictionary 912 (2002).

**5.** *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

trouble holding that the actual "frisk" had begun. Thus, I find no legally significant distinction between Officer Harvey's physical manipulation of Johnson and the "frisk" itself.[6]

Although the government argues that the "frisk" did not begin until Officer Harvey patted down the outside of Johnson's clothing, it has provided no authority to support its position, and I have found scant support. Furthermore, our prior cases suggest that the frisk began, at the latest, when Officer Harvey manipulated Johnson's body to effectuate the frisk. *See Jackson v. United States,* 805 A.2d 979, 987 (D.C.2002) ("[B]y the time [appellant] was asked to turn around (apparently in preparation for a frisk), and the officer touched [appellant's] jacket, the police crossed the critical line between consent and coercion." (citation and internal quotation marks omitted)); *Powell v. United States,* 649 A.2d 1082, 1087 (D.C.1994) (opinion of Sullivan, J.) (finding that factors that manifested themselves after the suspect was ordered to assume the position and after the decision to frisk had been made should not have been included in the reasonable suspicion determination); *id.* at 1090 (Farrell, J., concurring) (considering only facts known to the officers before "ordering [appellant] to place his hands on the car *and* patting him down"); *see also United States v. Christian,* 187 F.3d 663, 670 (D.C.Cir.1999) ("[W]e assess a *Terry* search from the standpoint of the moment of the stop . . . not from the subsequent period in which the officer begins to take protective measures.").

## II.

What, then, did the officers know at the time the frisk commenced, that is, at the time Officer Harvey moved Johnson into position, that would have given them reasonable, articulable suspicion that he was armed and dangerous? To pass constitutional muster, the officers had to have reasonable, articulable suspicion not simply that Johnson might be engaged in criminal activity, but that he might be *armed and dangerous. See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The trial court noted several factors that it believed would have given a well-trained officer the requisite suspicion. The trial court relied on the following factors:

1) Johnson was initially hesitant about pulling over;

2) Johnson was looking around, behind and to the side of him, and showed signs of nervousness or hyper-vigilance;

3) Johnson tried to exit his vehicle while Officer Harvey was still in his, having just stopped, and had to be ordered to stay in the car;

4) Having been told once to remain in the car, Johnson again tried to exit the

---

6. I would not hold that in all cases the inception of a frisk is an officer's physical contact with a suspect. I am conscious of the potential to create a perverse incentive for officers to prolong the period of time between when they have ordered a suspect to assume a frisk position and when the officer actually contacts the suspect. *Cf. United States v. Christian,* 187 F.3d 663, 670 (D.C.Cir.1999) (assessing a search under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), from the moment of the stop because "[o]therwise, we might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer" (internal quotation marks omitted)). I am also mindful that certain circumstances not present here may affect the point where police cross the line between "consent and coercion" so critical to Fourth Amendment analysis. *Jackson v. United States,* 805 A.2d 979, 987 (D.C. 2002). My analysis is limited to the facts before us and only holds that, *at the latest,* the frisk here began when Officer Harvey manipulated Johnson's person.

car, which Officer Harvey clearly found suspicious and of concern;

5) Johnson provided a false name (which Officer Harvey clearly did not know at the time) and seemed nervous during the stop;

6) Johnson had no license;

7) Johnson said he was returning from an errand to retrieve diapers, but none were visible in the car;

8) Officer Harvey described Johnson as being hyper and moving around a lot in the vehicle; and

9) The vehicle was in "try [and] locate" status, and therefore Johnson would not be able to leave with the vehicle, and must be investigated.

Looking only at the first eight factors, even in their totality, the majority does not hold that "the constitutional strictures of *Terry* and its progeny had been satisfied." Maj. Op. 368. Instead, the majority becomes comfortable with its holding only when it adds the "try and locate" status of the vehicle to the first eight factors, seemingly because it concludes that "try and locate" means that Johnson was driving a vehicle that could be regarded as stolen. *Id.* at 368–69. I, however, conclude that neither the first eight factors alone, nor those factors as augmented by the "try and locate" status of the vehicle, gave the officers reasonable, articulable suspicion that Johnson was armed and dangerous.

The stop was conducted during the day, and no evidence suggested that the area was a "high crime" location. *Cf. Umanzor v. United States*, 803 A.2d 983, 993 (D.C.

2002) (upholding a stop that occurred at 2:45 a.m. in response to a report of a stabbing involving a car of the same make and model as appellant's car). At the time of the frisk, Johnson had made no furtive hand movements, and Officer Harvey did not notice any bulge or other indication that Johnson was in fact armed. *Cf. In re D.E.W.*, 612 A.2d 194, 195, 198 (D.C.1992) (upholding a frisk where appellant unambiguously attempted to conceal a weapon). Here, the only basis for the stop was an expired inspection sticker, which did not give rise to any suspicion of criminal activity. Even Johnson's driving without a license would not give rise to the suspicion that he was armed and dangerous—as the trial court recognized—and Officer Harvey testified that driving without a license is not a crime for which one can be arrested in Pennsylvania.

Although the trial court found that Johnson was reluctant to pull over, no testimony suggested that he attempted to flee, and Officer Harvey acknowledged that Johnson stopped within half a block. *Cf. Powell*, 649 A.2d at 1085 (opinion of Sullivan, J.) (concluding that the trial court's ruling that the suspect's reluctance to stop contributed to reasonable suspicion was erroneous where the suspect pulled over within three quarters of a block). Nor were Johnson's attempts to exit the car, his ambiguous story about diapers,[7] or his nervousness sufficient indicators that he was armed and dangerous.[8] Officer Harvey testified that he did not know why Johnson was attempting to exit the car—

---

**7.** Officer Harvey testified that he doubted the story because he did not readily see any diapers in the car, but he also did not thoroughly examine the car and could not see into the trunk.

**8.** Because the "reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search,"

*Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (emphasis added), the fact that Johnson provided a fake name—which Officer Harvey clearly did not know at the time—cannot be considered in determining whether or not the frisk was supported by reasonable, articulable suspicion.

but did not testify that his attempts led him to believe that Johnson was armed and dangerous. Although police officers concerned for their safety during a traffic stop may ask a driver to exit the car, *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), the police may not frisk the driver without specific, articulable suspicion. *See United States v. Page*, 298 A.2d 233, 237 (D.C.1972). Even when combined with Johnson's nervousness and "hyperactivity," these factors fail to indicate why the police felt he was armed and dangerous. *See, e.g., Powell*, 649 A.2d at 1087 (opinion of Sullivan, J.) ("[H]esitancy and nervousness may not be unusual when people are stopped.") (quotation marks omitted); *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir.1998) ("[N]ervousness is of limited significance in determining reasonable suspicion . . . because it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." (citations and quotation marks omitted)).

Like the trial court, the majority relies heavily on the fact that the car was in "try and locate" status and that, as a consequence, Officer Harvey believed that the car might in fact have been stolen. Putting aside that the car should no longer have been in "try and locate" status (Johnson's girlfriend, who had initially reported the car overdue, had called police to report its return), nothing about "try and locate" status indicates that the operator of the car might be armed and dangerous. The record indicates that a car in "try and locate" status was a car that the owner had

lent to a friend or relative and that had not been promptly returned. The owner did *not* want it reported stolen, though after ten days the car was supposed to be upgraded to "stolen" in the system. Officer Harvey testified that frequently cars that are due to be upgraded to "stolen" are not upgraded properly, and the majority contends that this gave Officer Harvey reason to believe that the car was in fact "stolen," despite its "try and locate" status.[9] Even assuming that the driver of the "try and locate" car had indeed borrowed the car for longer than the owner expected, and further assuming that the car was overdue to be upgraded to "stolen," neither indicates that the car was somehow taken by force or that the driver might be presently armed and dangerous. To the contrary, it indicates that the car was willingly lent to the driver. *Cf. Thomas v. United States*, 553 A.2d 1206, 1206–08 (D.C.1989) (explaining that a ski mask could be indicative of the presence of weapons because ski masks are common in armed holdups).

The majority distorts the nature of "try and locate" status to get the officers over the hurdle of the need to establish reasonable, articulable suspicion. First, the majority seems to take solace in the fact that, had Johnson been stopped in the District of Columbia and found to have been engaged in the unauthorized use of a vehicle in violation of D.C.Code § 22–3215 (2001), the officers would have had probable cause to arrest him—and perforce to frisk him—because he would have been engaged in a felony. Maj. Op. 369 n. 4. Johnson was not stopped in the District of Columbia, however, and his conduct in Pennsylvania amounted to no more than a misdemeanor,

---

**9.** Johnson's girlfriend put the car into "try and locate" status on either June 5th or June 6th, and Johnson was stopped on June 14th. Thus, even if she had not reported the car returned, the car was not due to be upgraded

to "stolen" for at least another day. Officer Harvey's reliance on the possibility that the car was "stolen"—because its status change might have been overdue—was thus factually incorrect.

*see* 18 P<span style="font-variant:small-caps">A</span>. C<span style="font-variant:small-caps">ONS</span>.S<span style="font-variant:small-caps">TAT</span>. § 1104(2) (1990), and the testimony at trial confirmed that the officers had no intent to arrest him.

The majority further hypothesizes a "potentially lengthy . . . need for the police to keep [Johnson] in their presence while they investigated his identity and connection with the car." Maj. Op. 369. This seems a bit of an expansion of Officer Harvey's testimony, which was simply that when he encounters a car in "try and locate" status, he is trained to "remove the driver from the vehicle and recover the vehicle for the owner." After removing the driver, he has to investigate the driver, meaning that he checks for open warrants and confirms whether the driver has a valid license. Driving a car in "try and locate" status is not a crime, and drivers are free to go after they are investigated. There is nothing in the record to suggest that the investigation need be particularly lengthy. And, absent more, such an investigation cannot, as a matter of course, include a frisk for weapons. The Supreme Court has emphasized that while officers face legitimate and weighty safety concerns when conducting traffic stops, those concerns do not, in and of themselves, create reasonable, articulable suspicion to frisk occupants of vehicles. *See Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) ("[W]hile the concern for officer safety in this context may justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search."). To protect themselves, officers may conduct a brief *Terry* frisk *"upon reasonable suspicion* that [drivers or passengers] may be armed and dangerous." *Id.* at 118, 119 S.Ct. 484 (emphasis added). Thus, the fact that officers were required to remove Johnson from the vehicle and conduct an investigation cannot justify a frisk, where

nothing suggested that Johnson was armed and dangerous. *See Powell*, 649 A.2d at 1088 (opinion of Sullivan, J.) (noting that even *Mimms* does not allow for an "automatic frisk" of citizens pulled over for minor traffic violations).

Authorities relied on by the majority all exhibited a specific, articulable reason why the police thought that the suspect was armed and dangerous. In particular, the majority cites *State v. Cowart*, 862 So.2d 225, 231–32 (La.Ct.App.2003), where the suspect was pulled over for an expired inspection sticker, had no license, exited the vehicle as the officer approached, and was pacing around the vehicle with his hands near his waist. Although the facts are very similar to the instant case, one crucial fact sets it apart—in *Cowart*, the officer, who was alone, testified that he was unable to see what the suspect was holding because of the way he was holding his hands, and thus feared for his safety. *Id.* at 229, 231. Here, Officer Harvey pointed to nothing that actually made him (or would make a reasonable officer) believe Johnson might have been armed and dangerous. In fact, he testified that at the time he ordered the frisk, he did not believe Johnson was armed.

Even considering the totality of the circumstances, I would hold that there was no reasonable, articulable suspicion to frisk Johnson. Although the totality of the circumstances may have been puzzling or ambiguous—in fact they may have caused Officer Harvey to suspect that something was amiss—such "inchoate suspicion" is not sufficient to warrant a frisk. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *see also Singleton v. United States*, 998 A.2d 295, 300–01 (D.C.2010) ("[T]o be articulable, there must be specific evidence—not merely conclusions—that led the officer to suspect criminal activity in a particular circumstance."). The totality of the circum-

stances failed to indicate why a reasonable officer would suspect that Johnson was armed and dangerous. *See In re R.M.C.,* 719 A.2d 491, 496 (D.C.1998) (holding that there was no reasonable, articulable suspicion for a frisk despite suspect's walking unnaturally, clutching his rib cage, and acting nervously, because there was no evidence to indicate a weapon and no report of criminal activity outside of a curfew violation); *Anderson v. United States,* 658 A.2d 1036, 1040 (D.C.1995) (no reasonable, articulable suspicion despite suspect walking quickly away from officers, answering questions evasively, and putting his hands in his pockets despite being asked not to, because the officer "did not observe criminal activity, was not responding to a report of criminal activity, nor was he following up on an informant's tip" and "[t]here was no bulge or object being concealed that the officer could think was a weapon").

Because the various factors discussed above do not provide a reasonable, articulable suspicion that Johnson was armed and dangerous, I would hold that the trial court erred by denying Johnson's motion to suppress the fruits of Johnson's frisk.

### III.

Because I believe that Officer Morales's weapon and ammunition were erroneously admitted, I would reverse Johnson's conviction unless the government can demonstrate that its admission was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). To meet this "exacting standard," the "properly admitted evidence against the defendant must be 'overwhelming,'" and "[t]he government must show that there is no 'reasonable possibility that the evidence complained of might

have contributed to the conviction.'" *Ellis v. United States,* 941 A.2d 1042, 1048–49 (D.C.2008) (quoting *McCoy v. United States,* 890 A.2d 204, 212 (D.C.2006); *Chapman,* 386 U.S. at 23, 87 S.Ct. 824). "Indeed, the 'inquiry [under *Chapman*] ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether *the guilty verdict actually rendered in this trial was surely unattributable to the error.*'" *Ellis,* 941 A.2d at 1048–49 (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)) (emphasis in original).

Here, I would hold that the government cannot meet its burden. Officer Morales's weapon and ammunition were crucial to the government's case. Officer Morales was found with his holster empty, and as the prosecutor emphasized during closing argument, the logical conclusion was that the shooter had taken these items. Johnson's possession of these items—just four days after the shooting—was highly incriminating and likely led the jury to conclude that he had shot Officer Morales.[10] As the prosecutor argued to the jury, it was "no coincidence that Walter Johnson just happened to have that gun on him when he got stopped."

Although the government produced other evidence—including many witnesses who placed Johnson at or near the scene of the shooting—I cannot conclude that the evidence was so "overwhelming" that the verdict here was not influenced by the weapon. None of the government's witnesses actually witnessed the shooting, and the presence of the gun and ammunition—tangible evidence directly linking Johnson to the crime—likely relieved the jury of the difficult task of considering the accura-

---

10. Although Johnson told the police he had purchased the gun, he refused to identify the seller, which the prosecutor argued provided a reason to doubt his story.

cy of the various identifications. *See Benn v. United States*, 978 A.2d 1257, 1289 (D.C. 2009) ("The identification of strangers is proverbially untrustworthy."). Further, while both Ferguson and the Philadelphia victim provided compelling evidence against Johnson, our task is not to imagine whether the jury would have convicted Johnson absent the erroneously admitted evidence. Instead, our task is to consider whether or not the erroneously admitted evidence influenced the verdict here. I believe that Officer Morales's weapon and ammunition were simply too damning for there to be "no reasonable possibility that [they] might have contributed to the conviction." *Ellis*, 941 A.2d at 1049 (citation and internal quotation marks omitted).

### IV.

Because the trial court erred in denying Johnson's motion to suppress, and because the admission of Officer Morales's gun and ammunition was not harmless beyond a reasonable doubt, I would reverse Johnson's convictions.